No. 12394

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

ANDREW TAYLOR,

Defendant and Appellant.

Appeal from:  District Court of the Eighth Judicial District,
              Honorable Truman Bradford, Judge presiding.

Counsel of Record:

    For Appellant:

        Robert A. Tucker, Great Falls, Montana
        Jack L. Lewis argued, Great Falls, Montana

    For Respondent:

        Hon. Robert L. Woodahl, Attorney General, Helena,
         Montana
        Thomas J. Beers, Assistant Attorney General, appeared,
         Helena, Montana
        J. Fred Bourdeau, County Attorney, Great Falls, Montana
        Neil E. Ugrin, Deputy County Attorney, argued, Great
         Falls, Montana

                                    Submitted: September 11, 1973

                                    Decided: NOV 5 1973

Filed: NOV 5 1973

*Thomas J. Kearney*
                                        Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal by defendant Andrew Taylor from a judgment of the district court of Cascade County entered on a jury verdict of second degree murder. Defendant was sentenced to life imprisonment.

The facts of this case are repelling. However, our inquiry as appears hereinafter is whether or not defendant has had a fair trial; and not whether defendant may be guilty or innocent.

On the morning of December 22, 1971, Victoria Lynn Mullen died at Columbus Hospital in Great Falls, Montana. Death was caused by a massive subdural hematoma, i.e. a bleeding into the cranial cavity in the space separating the brain and the membrane lining the boney vault. Within six days of her death Vicky Mullen would have been two years old.

Vicky was the child of defendant's wife, Linda Taylor, by a previous marriage. The Taylors were married early in November 1971, and the marriage continued at least until after the trial of this cause. Shortly after the marriage defendant, an enlisted man in the United States Air Force, was reassigned to Malmstrom Air Force Base in Great Falls. It was the State's theory that shortly after the Taylors arrived in Montana the defendant embarked on a course of conduct which culminated in Vicky's death.

While there is a great deal of testimony in the record implicating defendant in Vicky's death, the most damaging is that of defendant's wife, Linda Taylor. Testifying over defendant's continuing objection based on the marital privilege provisions of sections 93-701-4(1) and 94-8802, R.C.M. 1947, Mrs. Taylor indicated that defendant frequently spanked the child very hard, often hard enough to leave bruises, when she soiled herself or misbehaved. She testified: that shortly after the family arrived in Montana defendant began to spank the child with a stick for wetting her pants and on at least one occasion there was blood on the stick following a

- 2 -

spanking; that defendant spanked the child on numerous occasions with a plastic stick and beat her with a belt leaving severe bruises, this also as punishment for misbehavior; that when Vicky refused to eat defendant would slap her, slam her head very hard against the back of the high chair and beat her head with a stick.

In another incident, Mrs. Taylor testified defendant became angry over the child's refusal to walk in a shopping center parking lot and backhanded her hard enough to knock her down. This occurred on December 13 or 14, 1971. On another occasion, defendant slapped the child for wetting her pants, causing her to strike her head against the armrest of the couch and go into convulsions. This occurred on the evening preceding the child's death. Mrs. Taylor also testified that on December 18, 1971, defendant tied a belt around the child's feet, strapped the belt to the doorknob and then opened and closed the door several times, causing the child to bang her head against the door. Also, that same evening he strapped the belt over the top of a door and suspended the child head down and then opened the door very quickly causing Vicky to fall to the floor on her head.

At trial, Mrs. Taylor admitted having made a number of prior statements as to the cause of Vicky's injuries which were inconsistent with her testimony at trial. She indicated the earlier accounts were false and that her account at the time of trial was true and accurate. However, under cross-examination, she did specifically affirm an earlier statement in which she said "He never really intentionally meant to hurt her. It was his way of disciplining her." She also testified the defendant played with the child, kissed her, often gave her treats of cookies and would look in on her at night to see if she was covered.

Mrs. Taylor's testimony was supported in part by the testimony of Mr. and Mrs. Hyatt. The Hyatts were close friends of the Taylors and the two families visited frequently. Both Hyatts testified as to defendant's punishment of the child. Mrs. Hyatt confirmed one

incident, testified to by Mrs. Taylor, when defendant spanked Vicky hard enough to produce bruises. She testified that on another occasion after defendant spanked Vicky, there was blood on his hand and her bottom. Mr. Hyatt testified he heard or saw defendant discipline Vicky on a number of occasions and that in his opinion the discipline administered by defendant was far too severe for a child of Vicky's age. Both Hyatts agreed the spankings they saw or heard being administered were for the purpose of disciplining Vicky for some misbehavior. They also testified that on occasion defendant displayed affection toward the child by hugging and kissing her.

Defendant testified on his own behalf and acknowledged disciplining the child by spanking and standing her in a corner as punishment for various misdeeds. Defendant also recalled the parking lot incident of December 13 or 14 when Vicky was having trouble walking but denied slapping her on that occasion. He denied ever having hit her with a belt, denied ever having hung the child from a door, and denied hitting her with sticks. In general, defendant denied mistreating Vicky in any of the ways testified to by his wife. He stated he knew of one fall which accounted for some of Vicky's bruises and that his wife had told him of other falls which would explain some of the other injuries.

The extent of Vicky's injuries was testified to by Dr. John Pfaff, Jr., a pathologist who performed the autopsy. He testified that the cause of death was bleeding which occurred in the space between the brain and the membrane lining of the skull. This bleeding was estimated to have begun approximately 10 to 13 days prior to death. However, the doctor believed there were episodes of rebleeding caused by injuries to the head which occurred between the time of the first injury and the time of death. Dr. Pfaff further stated that the entire scalp was swollen and had a "boggy" consistency, suggesting bleeding over the entire scalp. This condition was consistent with his finding that the bleeding which caused Vicky's death was the result of one or a series of severe

blows, with the area of initial bleeding being subsequently aggravated and enlarged by other severe blows to the head.

In further testimony, Dr. Pfaff stated the autopsy examination revealed additional multiple injuries. While these injuries were not directly related to the cause of death, they did tend to corroborate the testimony of Mrs. Taylor and the Hyatts as to repeated severe disciplinings of the child. These injuries included multiple bruises and abrasions of the face and neck areas; multiple bruises on both arms and legs; rather large bruises on both upper legs and the area of the thighs; and, at least two areas of hemorrhage in the abdomen resulting from severe blunt force impacts. The majority of these injuries had been inflicted from three to fourteen days prior to the child's death.

Dr. McKenzie testified he treated the child on December 3, 1971, and that he examined her again on December 9, 1971, at which time he noticed head and face injuries which would be classified as contusions and abrasions. He also testified that his examination of December 9 would have revealed a massive subdural hematoma, but he ascertained none. However, he did indicate that his examination would not have revealed that a bleeding process, which could end in a massive subdural hematoma, had begun.

Mrs. Taylor testified that following Vicky's death defendant gathered up the child's clothes and forced her to go with him to the dump where he discarded the bloody clothes, after giving a false name to the proprietor of the dump. Defendant, on the other hand, testified it was Mrs. Taylor who picked up the clothes, and that he took them to the dump and gave a false name and address there to protect his wife.

Finally, there was testimony by defendant's cell mate that defendant had told him he spanked the child with a belt and hit her with a belt, because she was a spoiled brat. He also testified defendant had said he did not really mean to hurt her, he was just trying to correct her.

At the close of the evidence, the district court refused defendant's offered instructions on voluntary and involuntary manslaughter. It also refused defendant's request for change in the general cautionary instruction regarding the credibility of witnesses which would have specifically instructed the jury to consider prior inconsistent statements as possibly repelling the presumption that each witness spoke true. Over defendant's objection, the court gave two instructions regarding the burden of proof to the effect that the State had only to prove guilt beyond a reasonable doubt.

On appeal, defendant raises numerous issues for review which we shall consider in this order:

(1) That the district court erred in refusing defendant's offered instructions on voluntary and involuntary manslaughter.

(2) That it was error to allow defendant's wife to testify over his objection.

(3) Corpus delecti was not established beyond a reasonable doubt.

(4) That it was error to admit over objection testimony "considering the possibility of Battered Child Syndrome".

(5) That testimony as to other injuries was improper.

(6) That the jury was not properly instructed regarding prior inconsistent statements.

(7) That it was error to qualify the State's burden of proof with the word "only" in two of the court's instructions.

Since only the failure to give the requested manslaughter instructions requires reversal and a new trial, we will consider issue (1), and then deal with the other issues only as their resolution bears on a new trial.

In justifying the district court's refusal of defendant's offered instructions on manslaughter, the State argues essentially two things. First, that once the commission of the homicide by the defendant is shown the burden of proving circumstances of mitigation devolves on the defendant and since in this case defendant denied

- 6 -

the doing of the acts causing death, rather than showing circumstances of mitigation, he failed to meet this burden and was not entitled to instructions on manslaughter. Second, the jury had the choice of believing either all the testimony of Mrs. Taylor or all the testimony of Mr. Taylor, and since the jury convicted Mr. Taylor it obviously believed Mrs. Taylor, whose testimony was sufficient to support a conviction for second degree murder.

The central proposition of the State's first argument is specifically established by section 94-7212, R.C.M. 1947, which provides:

> "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

It is immediately apparent from a consideration of section 94-7212, that there is an exception to the burden placed on a defendant of coming forward with evidence of mitigation, after proof of the commission of a homicide. This exception is applicable to those situations in which the proof relied on by the prosecution to establish guilt also tends to show circumstances of mitigation. This exception is well established in Montana's case law. State v. Rivers, 133 Mont. 129, 133, 320 P.2d 1004, describes it thusly:

> "Still there is an exception or modification to this general rule, most explicit in our Montana law. It is that such a presumption of malice does not exist in the face of evidence tending to show that the acts of the defendant amount only to manslaughter."

As in Rivers, this rule is most important in the instant case.

At trial, the State's principal witness, Mrs. Taylor, testified that defendant "never really intentionally meant to hurt her. It was his way of disciplining her." With regard to specific incidents, she testified that defendant's acts in striking the child were, with one exception, for purposes of discipline. Similarly the Hyatts' testimony, who were also State's witnesses, was to the effect that defendant's striking of the child was punish-

- 7 -

ment for various misdeeds. Even the admissions of the defendant, as related by his former cell mate, were to the effect that defendant struck the child as a punishment for being "spoiled", but he had not meant to hurt her.

From these facts attested to by the State's own witnesses, the inference could have been drawn by the jury that defendant inflicted the fatal injuries while disciplining the child. If the jury reached this conclusion under proper instructions, it could then have concluded that the death occurred as the result of the doing of a lawful act, the disciplining of a child permitted by section 94-605(4), R.C.M. 1947, in an unlawful manner or without due caution or circumspection.

A properly instructed jury could find involuntary manslaughter under the provisions of section 94-2507, R.C.M. 1947:

"Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds:

"(1) * * *

"(2) Involuntary, in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection."

Mrs. Taylor testified to one instance where defendant became angry with the child and slapped her hard enough to knock her down. This incident occurred near the critical time established by the medical testimony for the infliction of the initial injury causing the child's death. If the jury believed it was this incident which led to the onset of the hematoma, it could have found that the death was the result of "a sudden quarrel or heat of passion" and found defendant guilty of voluntary manslaughter under the provisions of section 94-2507(1), R.C.M. 1947.

Further, there was testimony by Mrs. Taylor that defendant played with the child, kissed her, often gave her treats of cookies and would look in on her at night to see if she was covered. The Hyatts also testified to displays of affection by defendant to the child. This testimony tends to put in issue the question

of malice. In State v. Thomas, 147 Mont. 325, 331, 332, 413 P.2d 315, this Court observed that testimony by the defendant stating affection and lack of ill feeling toward the deceased was sufficient to put in issue the question of malice by tending to "'eliminate' or 'negative' the presence of malice". Also in Rivers, testimony relating to the defendant's treatment of the deceased was held to show a lack of malice.

While the district court may have considered the evidence in support of manslaughter weak and inconclusive, still it was bound to instruct the jury on manslaughter since the weight to be given the evidence is a question for the jury. Section 95-1901(b), R.C.M. 1947, provides:

> "Questions of law shall be decided by the court, and questions of fact by the jury * * *."

Since the weight to be given testimony is in essence a question of fact, it follows that the court should have allowed the jury to resolve it by instructing the jury as to manslaughter.

The conclusion that the district court erred in refusing the offered manslaughter instructions is reenforced by this Court's observations in Thomas, where it stated:

> "It is a fundamental rule that the court's instructions should cover every issue or theory having support in the evidence."

The Court then, in Thomas, applied this general rule to homicide cases:

> "'Any evidence, however slight, which shows that the homicide was committed under such circumstances as to eliminate the element of malice, requires a charge on the law of manslaughter.'"

In view of the foregoing, the State's second argument justifying the refusal of the offered manslaughter instructions can be dealt with in a more summary fashion. It is premised on the assertion that the jury had the choice of believing all of Mrs. Taylor's testimony or all of Mr. Taylor's testimony. That premise is incorrect. A jury is not obligated to believe all of any witness's testimony. This Court in State v. Le Duc, 89 Mont. 545, 562, 300 P. 919, said the jury is:

"* * * at liberty to believe all, a part of, or none of the testimony of any witness."

Accordingly, even if the jury rejected all of defendant's testimony, it was still at liberty to believe only parts of Mrs. Taylor's testimony. With the right to reject any part of Mrs. Taylor's testimony, a properly instructed jury could have found that defendant struck the blow causing the fatal bleeding while disciplining the child and returned a verdict of involuntary manslaughter, or that the blow which caused the fatal bleeding was struck by defendant in sudden anger and returned a verdict of voluntary manslaughter.

To the second part of the State's argument--that the conviction should stand because Mrs. Taylor's testimony was sufficient to support a conviction for second degree murder--we merely observe that while this may be so, it is not enough. Mrs. Taylor's testimony also supports a manslaughter theory, thus requiring instructions on manslaughter. State v. Thomas, supra.

Since the evidence could be interpreted to support a finding that the killing was done without malice in the course of doing a lawful act without due circumspection; was done without malice in the doing of an unlawful act not amounting to a felony; or, was done without malice on a sudden passion; the failure to instruct the jury as to manslaughter requires reversal of this cause for new trial with a jury properly instructed.

This cause will be tried again so we will consider defendant's other specifications of error as they bear on a new trial. Chief among those specifications of error is the denial of defendant's claim of marital privilege against the admission of his wife's testimony. We find this specification of error to be without merit.

Defendant's contention is that his wife, Linda Taylor, could not testify against him over his objection. In support of his claim of marital privilege, defendant cites sections 93-701-4(1) and 94-8802, R.C.M. 1947. Section 93-701-4(1), provides:

"There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be

examined as a witness in the following cases:

"(1). A husband cannot be examined for or against
his wife without her consent; nor a wife for or
against her husband without his consent; nor can
either, during the marriage or afterward, be, without
the consent of the other, examined as to any communi-
cation made by one to the other during the marriage;
but this exception does not apply to a civil action
or proceeding by one against the other, nor to a
criminal action or proceeding for a crime committed
by one against the other."

Section 94-8802, R.C.M. 1947, provides:

"Except with the consent of both, or in cases of
criminal violence upon one by the other, or in case
of abandonment, or neglect of children by either
party, or of abandonment or neglect of the wife by
the husband, neither husband nor wife is a competent
witness for or against the other in a criminal action
or proceeding to which one or both are parties."

While both the State and defendant treat each of these

sections as applicable to this case, we find that only section

94-8802, R.C.M. 1947, need be considered on these facts. Section

93-701-4(1), R.C.M. 1947, a rule of evidence for civil causes,

is applicable to criminal causes only through the operation of

section 94-7209, R.C.M. 1947, which provides:

"The rules of evidence in civil actions are
applicable also to criminal actions, except as
otherwise provided in this code."

In the instant case, defendant and the witness are still husband

and wife. Since "this code" has fully provided in section 94-

8802, R.C.M. 1947, for the admission or exclusion of testimony

of persons who are still husband and wife, it is apparent that

it has been "otherwise provided" within the meaning of section

94-7209, R.C.M. 1947, excluding the applicability of section 93-

701-4(1), R.C.M. 1947, to this fact situation.

The State argues that Mrs. Taylor's testimony is admissible

against her defendant husband on a number of bases, including

assertions: that a wife can testify as to the acts as distinguished

from the communications of her husband; that a crime against the

wife's child is a crime against the wife for purposes of the

exception to the statute allowing a spouse to testify in cases

involving criminal violence by one spouse against the other; and,

- 11 -

that the wife's testimony is admissible under the exception
to the statute allowing one spouse to testify against the other
in cases involving "abandonment or neglect of children". We
do not comment on the validity of the first two grounds urged
by the State since we find this case squarely within the
explicit exception to the statute allowing one spouse to testify
against the other in cases of abandonment or neglect of children.

Defendant claims that for a definition of the term "neglect"
used in framing the exception we must rely on section 19-103(16),
R.C.M. 1947, which defines neglect as:

> "* * * a want of such attention to the nature or
> probable consequences of the act or omission as
> a prudent man ordinarily bestows in acting in his
> own concerns."

From this definition defendant then argues that the exception
cannot be applied to allow testimony when the charge is murder,
since murder requires an intent which denotes a willfulness in-
consistent with negligence. This position is untenable.

While defendant's statement of the statutory definition of
neglect is correct, it is incomplete in that section 19-103, R.
C.M. 1947, also provides that this definition shall apply only
"unless otherwise apparent from the context." In this case the
context is the statute, the purpose of which is the protection
of the sanctity of marriage and the home. We feel that the pur-
pose of the exceptions to this statute is also protective. In
the case of the exception related to the neglect of children,
the purpose is protection of children from abuse which could other-
wise be practiced without fear of retribution under protection
of the marital privilege.

If defendant's construction of this protective exception is
adopted, the protection would extend to injuries negligently in-
flicted but not willful assault, to a negligent homicide but not
to premeditated murder. Such a construction is clearly too narrow,
outraging both reason and justice. In this context a broader
definition of neglect is required than that offered by section

19-103, R.C.M. 1947. For the purposes of this exception, we hold that the term "neglect" includes any abuse of children whether inflicted negligently or intentionally. In adopting this construction we are satisfied that we reach a result which is required by both reason and justice and which is within the contemplation of the legislature at the time it enacted section 94-8802, R.C.M. 1947.

Under this construction of the marital privilege statutes, Mrs. Taylor's testimony will be properly admissible on retrial. It should be noted that in view of our discussion of issue (1), on retrial of this matter the jury will be instructed as to manslaughter thus raising the issue of negligence and making Mrs. Taylor's testimony admissible even under defendant's construction of this exception.

Considering defendant's third specification of error--that the State failed to establish corpus delecti sufficient to support a conviction of murder--it is sufficient at this time merely to observe that of the showings required by section 94-2510, R.C.M. 1947, there is no dispute as to the child's death and there was sufficient credible evidence to support the jury's finding that defendant was responsible beyond a reasonable doubt. Nothing more is required. State v. Medicine Bull, Jr., 152 Mont. 34, 445 P.2d 916; State v. Bosch, 125 Mont. 566, 242 P.2d 477.

Defendant's fourth and fifth specifications of error question the propriety of allowing certain testimony. While defendant's point that testimony as to "possibilities" "will not without more, supply evidence" (LaForest v. Safeway Stores, Inc., 147 Mont. 431, 414 P.2d 200) is well taken, it is not applicable to this case. The doctor was not asked if there was a possiblity of Battered Child Syndrome, but rather, if he had considered the possibility of Battered Child Syndrome. After he answered that question in the affirmative, he went on to describe such of his findings as supported the conclusion that the Battered Child Syndrome was present.

This further testimony takes the doctor's consideration out of the realm of mere possibility and makes it fully admissible as expert testimony.

Defendant also claims it was error for the court to allow testimony concerning injuries which were not specifically related to the cause of death. This testimony was clearly admissible on the first trial of this action, since one of the offenses charged was murder by torture and the condition of the body was evidence from the the jury could have inferred the essential element of intent to inflict cruel suffering. People v. Lawhon, 33 Cal.Rptr. 718, 723, 220 C.A.2d 311. We feel the testimony will also be admissible on retrial of this cause on the alternative ground of showing a common scheme, plan, or design to inflict injury on the child. While the general rule is that evidence of other offenses or of other similar acts at other times is inadmissible for the purpose of showing the commission of the particular crime charged, there are certain well established exceptions. State v. Tiedemann, 139 Mont. 237, 362 P.2d 529; State v. Jensen, 153 Mont. 233, 238, 455 P.2d 63. These exceptions are summarized in Jensen:

> "There are recognized exceptions to this general rule: similar acts with the same prosecuting witness, State v. Sauter, 125 Mont. 109, 232 P.2d 731 (1951); similar acts not too remote in time, State v. Nicks, supra; and 'where the evidence of other crimes tends to establish a common scheme, plan or system and where such other crimes are similar to, closely connected with and not too remote from the one charged, and also where they are so that proof of one tends to establish the other.' State v. Merritt, 138 Mont. 546, 357 P.2d 683 (1960); State v. Gransberry, 140 Mont. 70, 367 P.2d 766 (1962)."

Having established the exceptions, Jensen goes on to set out a three part test to guide the determination of what other acts can be admitted under the exceptions. The elements of the Jensen test are: "similarity of crimes or acts, nearness in time, and tendency to establish a common scheme, or plan or system." In Jensen a pattern of behavior is held to be a "common scheme or plan."

- 14 -

In the instant case, the testimony objected to went not directly to the acts of the defendant but rather to injuries from which acts could be inferred and which were corroborative of acts by the defendant testified to by other witnesses. These we hold are also admissible under the Jensen exceptions, if they meet the criteria of Jensen and can be related to defendant's acts. In this case, the criteria of Jensen are met in that: (1) Various beatings all administered to the same child are similar acts; (2) injuries inflicted within 21 days of death satisfy the requirement of nearness in time; and (3) by showing a continuous pattern of behavior toward the child there appears a common scheme or plan within the meaning of the exception. These injuries were sufficiently related to defendant by the testimony of other witnesses regarding the severe beatings administered by defendant to the child during the final 21 days of her life.

Defendant's final specifications of error relate to certain instructions given by the court. The court gave the general cautionary instruction on duties of the jury, No. 1.02C, Montana Jury Instruction Guide Criminal. In giving this instruction the court refused a request by defendant to specifically include in the instruction prior inconcistent statements as one of the factors which the jury should consider as possibly repelling the presumption that a witness speaks the truth. It is defendant's claim that the court erred in refusing to so specifically instruct the jury. Section 93-1901-12, R.C.M. 1947, specifically provides:

"A witness may also be impeached by evidence that
he has made, at other times, statements inconsistent
with his present testimony * * *."

Clearly, such an instruction would have been proper and in a case, such as this, where the State's principal witness had admittedly made a number of prior inconsistent statements, it would seem particularly appropriate. The giving of the instruction with the defendant's requested inclusion regarding prior inconsistent statements would better accord with the accepted principle of

fully and clearly instructing the jury as to the specifics of the law applicable to the case.

Defendant also objects to the use of the word "only" in certain of the court's instructions relating to the State's burden of proof and quantum of proof required to show proof beyond a reasonable doubt. We agree with defendant's contention that describing the State's burden as "only that degree of proof", and proof beyond a reasonable doubt as "only such proof as may" could tend to confuse a jury composed of laymen and in effect dilute the degree of guilt and proof the State is bound to establish. The use of the limiting word "only" is not necessary to clearly and fully describe the burden and should not be included in the instructions on retrial.

The judgment is reversed and the cause remanded to the district court for further proceedings not inconsistent with this opinion.

---------------------------------------------------
                        Justice

We Concur:

---------------------------------------------------
        Chief Justice

---------------------------------------------------

---------------------------------------------------
        Justices.

Mr. Justice Gene B. Daly, deeming himself disqualified, took no part in this opinion.