FILED

12/28/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0668

DA 19-0668

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 323

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

BANNER LEE BOYD,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
                    In and For the County of Custer, Cause No. DC 18-70
                    Honorable Michael B. Hayworth, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Koan Mercer, Assistant Appellate
            Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant
            Attorney General, Helena, Montana

            Wyatt A. Glade, Custer County Attorney, Miles City, Montana

                        Submitted on Briefs:  November 10, 2021

                                  Decided:  December 28, 2021

Filed:

                             _____
                                     Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     Defendant and Appellant Banner Lee Boyd (Boyd) appeals from the October 2, 2019 Judgment and Sentencing Order issued by the Sixteenth Judicial District Court, Custer County, which sentenced Boyd to 10 years at the Montana State Prison (MSP) for Assault on a Peace Officer and 80 years at MSP for Attempted Deliberate Homicide after he was convicted of both charges following a February 13-14, 2019 jury trial.

¶2     We address the following restated issues on appeal:

*1. Was there sufficient evidence presented to convict Boyd of attempted deliberate homicide?*

*2. Did the District Court err by imposing supervision conditions when it sentenced Boyd to an unsuspended prison term?*

¶3     We reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     On the evening of July 27, 2018, Boyd was drinking at the Olive Bar in Miles City. The bartender on duty asked the bar's owner, Jess Nelson (Nelson), to ask Boyd to leave. Nelson then approached Boyd and asked him to leave. Boyd was upset about being asked to leave the bar, and began a verbal altercation with Nelson which eventually spilled onto the street in front of the Olive Bar. From the patio of the bar, several patrons observed Boyd and Nelson's verbal altercation in the street.

¶5     The 5'6" Boyd repeatedly attempted to goad the approximately 6'5" Nelson into hitting him, calling him "baby boy" and telling him he had "one shot." Boyd also repeatedly started to walk away before returning to argue with Nelson some more. Finally,

2

Boyd said to Nelson, "Are you going to give me one shot? You wait right here. I will be back. You're going to give me one shot? I will be back." Boyd, who lived in a second-floor apartment across the street, then walked away and went up the stairs to his apartment.

¶6 After Boyd walked away from the verbal altercation with Nelson, Miles City Police Officer Ryan Ketchum, who had been on a routine patrol when he noticed Nelson and Boyd arguing in the street, arrived on the scene and spoke to Nelson. Neither Nelson nor any of the bar patrons had called the police about the altercation. Officer Ketchum remained in his vehicle while Nelson, who he knew, leaned in and spoke with him. Nelson explained to Officer Ketchum that he had kicked Boyd out of the bar, that Boyd said he was going to return, and that Nelson thought Boyd was going to return with a weapon. While speaking to Officer Ketchum, Nelson saw Boyd on the second floor of his apartment building and motioned for Boyd to come down and speak to the officer.

¶7 Officer Ketchum then drove forward to speak to Boyd. Boyd came down the stairs of his apartment building while Nelson returned to the sidewalk in front of the Olive Bar. Officer Ketchum asked for Boyd's identification, which Boyd initially declined to give him as he wanted to go back to his apartment. Officer Ketchum would not allow Boyd to leave, however, so Boyd gave Officer Ketchum his identification. When Officer Ketchum went to radio in Boyd's information to dispatch, Boyd began "swatting" at Officer Ketchum's hands. Officer Ketchum pushed Boyd up against the wall of the apartment building and attempted to handcuff him. Boyd resisted and the two went to the ground. Nelson and a

3

couple of the bar patrons, who had been watching from across the street, ran over to help Officer Ketchum. With Nelson's help, Officer Ketchum was able to subdue and handcuff Boyd. Officer Ketchum did a brief pat-down search but did not find any weapons.

¶8 While in handcuffs, Boyd continued to yell at Nelson, continuing to repeatedly call him "baby boy." Officer Ketchum attempted to walk Boyd to the patrol vehicle, but Boyd again struggled and the two went to the ground once more. Nelson again helped Officer Ketchum subdue Boyd, this time pressing Boyd's face into the pavement after Officer Ketchum told him to "[g]o ahead and do what you got to do." While his face was being pressed into the pavement by Nelson, Boyd shouted, "I surrender, I surrender." Boyd was then lifted from the ground and placed in the back seat of the patrol vehicle. While in the vehicle, Officer Ketchum again searched Boyd—this time discovering an approximately ten-inch kitchen knife Boyd had concealed in his pants. Boyd continued to call Nelson "baby boy" and yelled at him from the back of the patrol vehicle. Nelson asked Boyd what he was planning to do with the knife. Boyd answered, "[s]tab you in the heart." Nelson responded, "[g]ood, that's what I thought."

¶9 On August 16, 2018, Boyd was charged by Information with one felony count of Assault on a Peace Officer and one felony count of Attempted Deliberate Homicide. In addition, the State asked for a weapons enhancement on the Attempted Deliberate Homicide charge. The matter ultimately went to a jury trial on February 13-14, 2019. The original Information stated the incorrect penalty for Assault on a Peace Officer, so the State filed an Amended Information correcting the error on the morning of the first day of trial.

4

At trial, the jury heard testimony during the State's case-in-chief from Nelson, Jeremy Smith, Amanda Desjarlais, and four officers with the Miles City Police Department—Officer Coy Sheets, Lieutenant Dan Baker, Officer Ketchum, and Captain Casey Prell. At the close of the State's case, Boyd moved to dismiss the attempted deliberate homicide charge for lack of sufficient evidence. The District Court denied Boyd's motion, finding the State presented sufficient evidence Boyd committed the offense of attempted deliberate homicide for the matter to go to the jury. Boyd then took the stand and testified in his own defense.

¶10 After deliberation, the jury convicted Boyd on both the assault on a peace officer and attempted deliberate homicide charges, but found Boyd did not "knowingly display[], brandish[], or otherwise use[] a dangerous weapon" when committing the offense of attempted deliberate homicide. At the sentencing hearing on October 1, 2019, the District Court sentenced Boyd to 10 years at MSP for Assault on a Peace Officer and 80 years at MSP for Attempted Deliberate Homicide, with no time suspended on either charge. In addition, the District Court orally imposed supervision conditions in the event of Boyd's release:

> The terms, conditions, and requirements for the PSI are imposed as conditions if you are returned to the community. In addition, the Court does specifically and explicitly require that you be subject to medication as a term of your release.

> I believe I do have the authority to require the medication given the recommendations from the -- given the recommendation of the Montana State Hospital as a condition that is directly related to your needs and your safety in the community.

In its October 2, 2019 Judgment and Sentencing Order, however, the District Court stated it was "recommend[ing]" the PSI and medication conditions if Boyd was paroled, not imposing them as it previously stated during the sentencing hearing.

¶11 Boyd appeals. Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶12 We review a district court's denial of a motion to dismiss a criminal charge for insufficient evidence de novo. *State v. McAlister*, 2016 MT 14, ¶ 6, 382 Mont. 129, 365 P.3d 1062 (citing *State v. Swann*, 2007 MT 126, ¶¶ 18-19, 337 Mont. 326, 160 P.3d 511). Whether sufficient evidence exists to convict a defendant is also reviewed de novo. *State v. Gunderson*, 2010 MT 166, ¶ 58, 357 Mont. 142, 237 P.3d 74 (citing *Swann*, ¶ 19). "The standard of review of sufficiency of the evidence on appeal is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Gunderson*, ¶ 58 (citing *State v. Fish*, 2009 MT 47, ¶ 27, 349 Mont. 286, 204 P.3d 681).

¶13 We review criminal sentences for legality. *State v. Coleman*, 2018 MT 290, ¶ 4, 393 Mont. 375, 431 P.3d 26. A sentence is legal if it falls within the statutory parameters. *State v. Clark*, 2008 MT 112, ¶ 8, 342 Mont. 461, 182 P.3d 62.

## DISCUSSION

¶14 *1. Was there sufficient evidence presented to convict Boyd of attempted deliberate homicide?*

¶15 "A person commits the offense of attempt when, with the purpose to commit a specific offense, the person does any act toward the commission of the offense."

6

Section 45-4-103(1), MCA. "A person commits the offense of deliberate homicide if . . . the person purposely or knowingly causes the death of another human being[.]" Section 45-5-102(1)(a), MCA.

¶16 In this case, Boyd was charged with, and convicted of, attempted deliberate homicide. While this is a weighty charge, the facts of the case are straightforward. Boyd, upset at being kicked out of the Olive Bar by Nelson, got into a verbal altercation with Nelson which spilled out into the street. Boyd repeatedly tried to antagonize Nelson into a physical fight, which Nelson declined. Eventually, Boyd walked away and went up to his apartment across the street, where he retrieved a large kitchen knife and placed it down his pants. When Boyd left his second-floor apartment, Nelson was speaking with Officer Ketchum in the street. Nelson beckoned Boyd down to speak with Officer Ketchum, so Boyd came down the stairs to meet Officer Ketchum.[1] Boyd was subsequently arrested and the kitchen knife was found once he was placed into the patrol vehicle. While Boyd was handcuffed in the back of the patrol vehicle, Nelson asked Boyd what he was planning to do with the knife, to which Boyd responded, "[s]tab you in the heart." As alleged in the Amended Information, in committing the offense of attempted deliberate homicide, "[Boyd] stated he was going to use a knife to stab Jesse Nelson in the heart. When [Boyd] was arrested, a large kitchen knife was found in the waist area of his pants."

---

[1] The portion of the dissent reciting Boyd's intent and his statement, "What did you stop me for, sir? What did you stop me for, sir . . . what the fuck did you stop me for?" is not relevant and is designed only to obfuscate the legal issue requiring an overt act. The quoted language is used to inaccurately suggest Boyd was asking the officer why he stopped him from murdering Nelson rather than asking the officer why he made contact with Boyd in the first place.

7

¶17 Not all acts toward the commission of a crime are sufficient for an attempt conviction. As we have long held, there "must be an 'overt act' that reaches 'far enough towards the accomplishment of the desired result to amount to the commencement of the consummation.'" *Gunderson*, ¶ 59 (quoting *State v. Mahoney*, 264 Mont. 89, 97, 870 P.2d 65, 70 (1994)). In addition, "'there must be at least some appreciable fragment of the crime committed, and it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter.'" *State v. Colburn*, 2016 MT 246, ¶ 11, 385 Mont. 100, 386 P.3d 561 (quoting *Mahoney*, 264 Mont. at 97, 870 P.2d at 70).

¶18 In order to sustain Boyd's attempted deliberate homicide conviction, the State was required to put forth sufficient evidence showing Boyd committed an "overt act" which reached far enough towards the accomplishment of attempting to kill Nelson which would amount to the commencement of the consummation of deliberate homicide. *Gunderson*, ¶ 59. The State contends Boyd's overt acts towards attempting to kill Nelson were (1) leaving the verbal altercation; (2) retrieving a knife; (3) concealing a knife; and (4) returning to confront Nelson with the knife. The State asserts the "only reason" Boyd failed to stab Nelson in the heart was because he was "intercepted by Officer Ketchum."

¶19 Of the four "overt acts" alleged by the State, when viewed in the light most favorable to the prosecution, three—leaving the verbal altercation, retrieving a knife, and concealing a knife—could possibly show Boyd was preparing to kill Nelson by using a knife, but none show a crime "in such progress that it will be consummated unless interrupted by

8

circumstances independent of the will of the attempter," *Colburn*, ¶ 11, and therefore cannot be "overt acts" which sustain an attempted deliberate homicide conviction. This leaves only the State's fourth contention, that Boyd returned to confront Nelson with the knife, for our consideration. The problem with the State's contention in this regard is quite simple: Boyd's "return to confront" Nelson *never happened*.

¶20 When Boyd opened the door to his apartment with the knife in his pants and stepped outside, Nelson was already speaking with Officer Ketchum in the street. After leaving his apartment, Boyd did not come down the stairs, rush at Nelson, display the knife, or thrust the knife at Nelson's heart in an attempt to kill him. In fact, Boyd was simply on the landing of his second-floor apartment, across the street from Nelson, when Nelson beckoned him down to speak with Officer Ketchum and Boyd obliged Nelson's call. It was only after Boyd was arrested and handcuffed in the back of the patrol vehicle when both the knife was discovered and Boyd stated he was going to stab Nelson in the heart. Boyd may have been prepared to kill Nelson by getting a knife, but he made no overt actions towards attempting to actually kill him with it. Indeed, the jury specifically rejected the State's request for a weapons enhancement and its contention Boyd "knowingly displayed, brandished, or otherwise used a dangerous weapon" while committing the offense of attempted deliberate homicide because Boyd simply possessed a knife—he took no steps to actually use it.

¶21 "A party may purchase and load a gun, with the declared intention to shoot his neighbor; but, until some movement is made to use the weapon upon the person of his

9

intended victim, there is only preparation, and not an attempt. For the preparation he may be held to keep the peace; but he is not chargeable with an attempt to kill." *State v. Rains*, 53 Mont. 424, 428, 164 P. 540, 542 (1917) (quoting *People v. Murray*, 14 Cal. 159, 159-60 (Cal. 1859)).[2] Here, Boyd walked out of his apartment door with a knife in his pants. He made no movement to use the weapon upon Nelson's person, so "there is only preparation, and not an attempt." *Rains*, 53 Mont. at 428, 164 P. at 542. In *Rains*, this Court dismissed an attempted murder charge after Charles Rains attacked Elizabeth Rains on the street, struck her in the face, forced her to return to his house, and locked her inside. Throughout this attack, Charles was armed with a revolver, a rifle, and a bottle of laudanum. After locking Elizabeth inside, Charles left to get a pail of water and Elizabeth escaped. *Rains*, 53 Mont. at 425-26, 164 P. at 541. Charles was charged and convicted of attempted murder, but this Court reversed as it was not clear if Charles intended to "shoot her with the revolver, club her to death with the rifle, force the laudanum down her throat, or drown her in the waterpail," and, if he did intend to kill Elizabeth, what act he performed which would have killed her, but for the interruption of her escape. *Rains*, 53 Mont. at 429, 164 P. at 542.

---

[2] The Dissent distorts this quoted passage by conveniently omitting the language from the quote that provides the crux of the case—the preparation of obtaining a weapon with a declared intention to kill a particular person is insufficient to constitute the required overt act to establish an attempted deliberate homicide. Dissent, ¶ 43. Were we to adopt the evidentiary standard advocated by the Dissent any idle threat made by someone who possesses anything which could arguably be used as a weapon could be charged with, and convicted of, attempted deliberate homicide.

¶22 The State contends this case differs from *Rains* because "Boyd repeatedly and consistently announced his intention to kill Nelson." Though other witnesses testified they heard Boyd threaten to kill Nelson before leaving to go to his apartment, according to the testimony of both Nelson and Boyd—the two parties actually involved in the altercation—Boyd did not threaten to kill Nelson until after he was handcuffed and placed in the back of a police vehicle. Regardless of whether Boyd's threat came before or after he had been detained by police, there was only preparation in this case, not attempt. For sufficient evidence to support an attempted deliberate homicide conviction, Boyd must have committed an overt act which reached "far enough towards the accomplishment of the desired result to amount to the commencement of the consummation." *Gunderson*, ¶ 59. As in *Rains*, we are left to ask what act could that be? Stepping outside with a knife in his pants? Clearly that cannot be enough, because "there must be at least some appreciable fragment of the crime committed, and it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter." *Colburn*, ¶ 11. To murder Nelson, Boyd would have had to come down the stairs, go across the street, find Nelson (who was nearly a foot taller and over 100 pounds heavier than Boyd), get the knife out of his pants, and stab him in the heart. Boyd did none of those things. The State asserts the "only reason" all of those things did not happen was because Officer Ketchum "intercepted" Boyd before he could do them. Such is nothing more than mere speculation.

¶23 Viewing the evidence in the light most favorable to the prosecution, *Gunderson*, ¶ 58, we are not convinced Officer Ketchum's "intercept[ion]" of Boyd was the only thing standing between Boyd and the murder of Nelson for the simple reason that Officer Ketchum did not have to intercept Boyd at all. Boyd was on the landing of his second-floor apartment when Nelson beckoned him down to the street to speak with Officer Ketchum.[3] Boyd then walked down the stairs to speak with Officer Ketchum. This was less of an interception and more of an arranged meeting. A conviction for attempted deliberate homicide requires more than possibly threatening to kill someone and then standing outside your house with a knife concealed down your pants. Boyd's hidden knife was in no danger of killing Nelson, who was located across the street. "[U]ntil some movement is made to use the weapon upon the person of his intended victim, there is only preparation, and not an attempt." *Rains*, 53 Mont. at 428, 164 P. at 542. Boyd may have been prepared to kill Nelson, but he did not make an attempt to complete the crime and there is insufficient evidence to support his conviction in this case.

¶24 The State did not present sufficient evidence to convict Boyd of the crime of attempted deliberate homicide, and therefore his conviction must be reversed and

---

[3] The Dissent acknowledges Boyd did not even start down the stairs, let alone cross the street, after obtaining the knife but nevertheless asserts "he was headed in the direction of Nelson." Dissent, ¶ 44. This appears a complete admission that Boyd did not do enough for an "overt act" towards committing a deliberate homicide. While Boyd obtained a knife, under our standard as set forth in *Rains*, he needs to attempt to use it to be convicted of attempt. "Head[ing] in the direction" without going down the stairs and across the street is meaningless as Nelson was clearly never in danger from the knife and an attempt conviction requires "some movement [] made to use the weapon upon the person of his intended victim[.]" *Rains*, 53 Mont. at 428, 164 P. at 542.

remanded to the District Court with instructions to dismiss the attempted deliberate homicide charge with prejudice. As the charge is dismissed, it is unnecessary to reach Boyd's alternative claim regarding ineffective assistance of counsel and the "purposely" jury instruction given at trial.

¶25 *2. Did the District Court err by orally imposing supervision conditions when it sentenced Boyd to an unsuspended prison term?*

¶26 While we reverse Boyd's attempted deliberate homicide conviction, his assault on a peace officer conviction and sentence remain intact. The District Court sentenced Boyd to 10 years at MSP, with none suspended, on the assault on a peace officer charge. In its oral pronouncement of sentence, the District Court imposed numerous supervision conditions, including psychiatric medication, in the event of Boyd's release back into the community on parole. Boyd does not challenge his assault on a peace officer conviction or the 10-year sentence, but does appeal the orally-imposed supervision conditions and asks that they be reversed. The State concedes the District Court erred by imposing supervision conditions in its oral pronouncement of Boyd's unsuspended prison sentence, but asserts the proper remedy is to simply strike the conditions from the oral pronouncement of sentence. We agree with the State.

¶27 Sentencing judges only have the power to impose those parole conditions which are specifically and explicitly authorized by statute, and do not have a residual or inherent authority to generally impose parole conditions. *State v. Burch*, 2008 MT 118, ¶ 36, 342 Mont. 499, 182 P.3d 66. Because no portion of Boyd's sentence was suspended, the District Court did not have authority to orally impose conditions on Boyd's possible parole.

13

*Gunderson*, ¶ 109 (citing *Burch*, ¶ 36). "[W]hen a portion of a sentence is illegal, the better result is to remand to the district court to correct the illegal provision." *State v. Heafner*, 2010 MT 87, ¶ 11, 356 Mont. 128, 231 P.3d 1087. "Striking or vacating illegal conditions of a sentence when they could be corrected on remand could eliminate conditions that support important public policies such as protecting crime victims or rehabilitating the criminal." *Heafner*, ¶ 12.

¶28 Though Boyd asks this Court to remand his sentence to completely strike the illegal conditions of parole, Boyd's oral pronouncement of sentence is capable of correction. His written judgment and sentence already correctly notes the District Court's conditions are recommendations. As in *Heafner*, Boyd's sentence may be corrected by remanding to strike the conditions the court stated were conditions of parole and by restating those conditions "as recommendations to the Board of Pardons and Parole for consideration in any future parole proceeding." *Heafner*, ¶ 13. In this case, the written judgment already does so, therefore we remand for the District Court to strike the conditions from the oral pronouncement of sentence, but leave Boyd's written judgment and sentence undisturbed.

## CONCLUSION

¶29 There was insufficient evidence presented to convict Boyd of attempted deliberate homicide. Boyd's attempted deliberate homicide conviction is reversed, and this matter is remanded to the District Court with instructions to dismiss the attempted deliberate homicide charge with prejudice. In addition, the District Court erred when it orally imposed conditions in its oral pronouncement of sentence in this case. Upon remand, the

District Court shall strike the conditions it orally stated as conditions of parole, though they may properly remain as recommendations in the written judgment.

¶30    Reversed and remanded.

/S/ INGRID GUSTAFSON

We concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER

Justice Jim Rice, concurring in part and dissenting in part.

¶31    I concur with the Court's resolution of Issue 2, but dissent from Issue 1.

¶32    Our scope of review for the sufficiency of evidence supporting a jury verdict is "necessarily very limited," *Byers v. Cummings*, 2004 MT 69, ¶ 16, 320 Mont. 339, 87 P.3d 465 (citation omitted), and we determine whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime met beyond a reasonable doubt.  *State v. Fleming*, 2019 MT 237, ¶ 12, 397 Mont. 345, 449 P.3d 1234 (citation omitted).  "[W]e will not reverse a jury verdict which is supported by substantial credible evidence." *Byers*, ¶ 16.  Indeed, "[w]hen sufficiency of the evidence is challenged, it is *our job as an appellate court to probe the record* for evidence to support the fact-finder's determination." *State v. Dineen*, 2020 MT 193, ¶ 14, 400 Mont. 461, 469 P.3d 122 (quoting *Murray v. Whitcraft*, 2012 MT 298, ¶ 26,

15

367 Mont. 364, 291 P.3d 587). (Emphasis added.) We review a jury's verdict "to determine whether sufficient evidence exists to support the verdict, not whether the evidence *could have* supported a different result." *Fleming*, ¶ 12 (emphasis added) (citation omitted). "[I]t is not this Court's function to agree or disagree with the jury's verdict." *Byers*, ¶ 16.

¶33 The jury's expansive charge stands in stark contrast to our limited role. The jury's role as factfinder includes accepting or rejecting testimony, weighing the evidence, evaluating the credibility of witnesses, and making all legitimate inferences that can legally be drawn from the evidence presented. *State v. Christensen*, 2020 MT 237, ¶ 118, 401 Mont. 247, 472 P.3d 622; *State v. Sanchez*, 2017 MT 192, ¶ 18, 388 Mont. 262, 399 P.3d 866; *State v. Bekemans*, 2013 MT 11, ¶ 20, 368 Mont. 235, 293 P.3d 843. Importantly for this case, "conflicting testimony does not render evidence insufficient to support a conviction." *State v. Dewitz*, 2009 MT 202, ¶ 85, 351 Mont. 182, 212 P.3d 1040. Instead, a jury "determines which version of events prevails." *State v. McAlister*, 2016 MT 14, ¶ 12, 382 Mont. 129, 365 P.3d 1062 (citation and internal quotation omitted). "In cases where we consider the sufficiency of the evidence, we will not substitute our judgment for that of the jury, which is able to view firsthand the evidence presented, observe the demeanor of the witnesses, and weigh the credibility of each party." *State v. Kelley*, 2005 MT 200, ¶ 22, 328 Mont. 187, 119 P.3d 67 (citation omitted). We are not entitled to draw our own inferences from the evidence, and thus it is irrelevant how we would have interpreted the evidence had we been members of Boyd's jury. Therefore, our only role is

to determine if there was substantial, credible evidence presented that any rational juror could determine met the elements of attempted deliberate homicide. Evidence is considered substantial and credible when "a reasonable mind accepts it as adequate to support a conclusion." *Byers*, ¶ 21. For attempted deliberate homicide, "the State was required to prove that [Boyd], with the purpose to commit deliberate homicide, committed any act constituting a material step toward the commission of deliberate homicide." *State v. Jackson*, 2009 MT 427, ¶ 24, 354 Mont. 63, 221 P.3d 1213; § 45-4-103(1), MCA.

¶34 I believe that, in violation of these standards, the Court has adopted its own interpretation of the evidence and then reached its own verdict based thereon.

¶35 First, about the record. Contrary to the impression that could be drawn from the Court's Opinion and from the parties' briefing, there is no singular video showing the incident that may be viewed like a movie. Instead, there are multiple videos, each capturing portions of the incident, and indeed, some parts of the incident are not filmed at all. For example, there is no video of Boyd on or traversing the balcony of his apartment; unfortunately, this part of the incident occurs completely off camera, although his descent down the stairs can be seen.[1] There is not a singular video showing both Nelson beckoning to Boyd and Boyd coming down the stairs in response. These must be pieced together from

---

[1] The tiny portion of the balcony at the top of the stairs that can be seen on video is not without significance, however. Boyd's apartment and balcony are around the corner and face away from the Olive Bar and the street running in front of the Bar. Had Boyd stayed in his apartment or merely stepped out onto his balcony, he would have never come back into view along the street where the incident occurred. Only because he exited his apartment and traversed the balcony toward the stairs and toward the Olive Bar did he come back into the view of those on the street.

separate videos, rendering the exact timing of their interaction uncertain.  For example, the jury could not tell for sure when Boyd did or did not see Nelson motioning from beside the police car, based on the videos.  This Court cannot either. What we do have is the footage showing Boyd starting to descend the stairs, and conflicting witness testimony.[2]

¶36    Further, our duty to independently "probe the record," *Dineen*, ¶ 14, for evidence supporting the jury's verdict includes consideration of the post-arrest ferrying of Boyd in the cruiser to the police station, recorded on video, during which an agitated Boyd repeatedly screams to Officer Ketchum (Ketchum), "Why did you f------ stop me?  Why did you f------ stop me?"  The interpretation of these words by Boyd and the inferences to be drawn therefrom were tasks solely for the jury.

¶37    With the full record before us, we consider whether the jury could have found the elements of attempted deliberate homicide met, starting with intent.  The question is whether there was substantial credible evidence for a rational juror to determine that Boyd acted "with the purpose to commit deliberate homicide."  Perhaps the most direct evidence was Boyd's statement from the police cruiser that his intention was to use the knife to "stab [Nelson] in the heart."  It was the jury's task to determine the sincerity of this statement. Indeed, as Boyd's defense attorney told the jury in his opening statement:

> And in the heat of the moment, Mr. Nelson yelled at [Boyd], 'What were
> you going to do with that knife?'  And you will hear him, Mr. Boyd, on the

---

[2] The video showing Nelson and Officer Ketchum's conversation shows Nelson motion to Boyd at timestamp 06:35:10.  The camera focused toward Boyd's apartment complex recorded video showing him start to descend the stairs starting at timestamp 06:35:05.  Without regard to the reliability of the surveillance cameras, the timestamp information from two separate cameras capturing different perspectives of the same event introduces some ambiguity.

video say, 'Stab you in the heart.' Now what does that mean? That will be crucial . . . . does it mean that was his intention at the time when he went and got that knife? *That will be for you to decide.* [(Emphasis added.)]

¶38 The jury decided to accept the State's proffered interpretation of the evidence: Boyd meant what he said from the cruiser—his purpose was to kill Nelson. This is not surprising, because Boyd's other actions can readily be seen as consistent with his words, and supportive of the jury's conclusion. The State presented testimony from Jeremy Smith, a patron who witnessed the argument between Boyd and Nelson outside the Olive Bar, who testified: "I came out [of the bar] to [Boyd] basically saying that he was going to bury [Nelson] and he kept inviting him to go for a walk down by the river so he could bury him. Then he asked us for help in digging a hole for him." Amanda Desjarlais, Boyd's property manager, observed the altercation from a portion of the balcony where she could see the street. She testified that she heard Boyd tell Nelson that "he was going to get a knife or a gun and he was going to kill him, more or less." Boyd's repeated statements to Ketchum during the ride to the station, "Why did you f------ stop me?," could also be interpreted consistently with this intention.

¶39 The Court correctly notes that neither Boyd nor Nelson, who were the participants in the altercation, testified Boyd had made death threats toward Nelson. But under the limited standards of review, this is meaningless. Faced with conflicting testimony, the jury was entitled to choose which evidence to believe, *McAlister*, ¶ 12, and the testimony of a single witness believed by the jury is sufficient to prove a fact. *State v. McCoy*, 2021 MT 303, ¶ 30, 406 Mont. 375, __ P.3d __ (citing *State v. Kaske*, 2002 MT 106, ¶ 25, 309 Mont.

19

445, 47 P.3d 824). Whether the jury *could have* instead chosen another or better supported interpretation of Boyd's intent, based on his words or actions, is irrelevant. *Fleming*, ¶ 12.

¶40 Similarly, the Court appears to endorse a particular evidentiary version of the incident by concluding, "After leaving his apartment, Boyd did not come down the stairs . . . In fact, Boyd was simply on the landing of his second-floor apartment, across the street from Nelson, when Nelson beckoned him down to speak with Ketchum and Boyd obliged Nelson's call." Opinion, ¶ 20. The assertion that Boyd was "simply on the landing" when Nelson called him down (apparently, in the Court's view, merely standing there inertly), is taken from Boyd's testimony, wherein he stated, "I wasn't on my way walking . . . . I was on top of the stairs, because I wanted to basically be able to walk down, walk around the neighborhood, go to a different bar." He further testified he came back down the stairs "[b]ecause I was called down and I went to go speak to Mr. Ketchum." The jury could have chosen to accept this version of Boyd's actions and intent, but there were reasons, based on the evidentiary record, the jury could have decided not to. Boyd's testimony raised significant credibility issues for the jury's determination. Captain Casey Prell (Prell), who conducted a post-arrest interview of Boyd, testified that Boyd gave multiple inconsistent statements about his actions and intentions concerning the knife. He testified Boyd variously told him his purposes in retrieving a knife were: because he was scared of Nelson; so he would be able to drink more without being bothered; that "nobody was going to [] tell him what to do"; and for the purpose of going back to the Olive Bar and confronting Nelson. Boyd's testimony at trial contradicted these statements to Prell as well

20

as his actions recorded on video—discrepancies Boyd justified by asserting he had suffered a concussion during his encounter with Ketchum and Nelson—testifying that, "I never ever retrieved a knife from my apartment," and that he had no intention of returning to the Olive Bar. Undermining Boyd's trial testimony, Ketchum's recovery of the knife from Boyd's person in the video was viewed by the jury, and the knife was presented as evidence at trial. Given this evidence, a rational juror could well have rejected Boyd's version of events as lacking credibility, and decided instead to believe the state's witnesses. *See Kelley*, ¶ 22 ("a jury is at liberty to believe all, a part of, or none of the testimony of any witness") (citing *State v. Taylor*, 163 Mont. 106, 116, 515 P.2d 695, 701 (1973)).

¶41 Further, Boyd's testimony about his actions conflicted with Nelson's testimony, who testified he called Boyd down after Boyd had already turned the corner from his apartment and came back into view. Under this competing version, Boyd left his apartment possessing a knife he had concealed, traversed his balcony, turned the corner to come into view, and was *in motion heading back* in the direction of the Olive Bar and Nelson. The jury could have interpreted Boyd's actions in multiple ways, including how the Court sees it; but the jury could also have fairly interpreted this sequence of actions, uninterrupted until Boyd saw Nelson and Ketchum, to be not only evidence of a homicidal intention but a "direct movement toward the commission after the preparations are made," in satisfaction of the second element of attempted deliberate homicide—the overt act requirement. *State v. Rains*, 53 Mont. 424, 428, 164 P. 540, 542 (1917). This version could be understood as

21

being confirmed by Boyd's multiple recorded statements to Ketchum in the cruiser, "Why did you f------ stop me?"

¶42     Analyzing the totality of evidence available to the jury to support a conviction, Boyd argued with Nelson and then said, "Are you going to give me one shot? You wait right here. I will be back," and departed to go to his apartment. Two witnesses testified that Boyd's comments included a threat to kill Nelson. Nelson testified to being concerned about Boyd's intentions. Boyd returned to his apartment, obtained a knife, and concealed it. Boyd came out of his apartment, traversed the balcony in the direction of the Olive Bar, and turned the corner of his building at the top of the stairs, coming back into visual view about one minute and 20 seconds later, and in motion toward the Olive Bar.[3] Nelson motioned for Boyd to come down from beside Ketchum's police cruiser. Boyd came down part of the stairs, hesitating for about five seconds before descending the rest of the way, and then waiting on the sidewalk a little more than five seconds before Ketchum arrived at that location. Boyd spoke with Ketchum, but then physically assaulted him. After being subdued and placed into the cruiser, Boyd's knife was discovered. Boyd stated he intended to stab Nelson in the heart with the knife, and in the post-arrest ride to the station, he angrily and repeatedly asked Ketchum why he had stopped him.

---

[3] The video footage shows that Nelson is at the window of the police car describing the situation to Ketchum approximately 40 seconds after Boyd departed the initial confrontation and is out of frame. Nelson is seen describing the situation to Ketchum for another approximately 40 seconds before the police car starts moving and Nelson makes the motion "calling down" Boyd.

¶43    In my view, there was sufficient evidence for a rational juror to conclude, directly or by permissible inference, that the elements of attempted deliberate homicide had been proven beyond a reasonable doubt, including the intent to commit homicide and the commission of an overt act.  As the Court notes, an attempt "must consist of more than mere preparation and [] there must be some overt act committed in furtherance of the offense charged."  *State v. Fish*, 190 Mont. 461, 468-69, 621 P.2d 1072, 1077 (1980).  While preparation "consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the *direct movement toward the commission after the preparations are made . . . . [U]ntil some movement* is made to use the weapon upon the person of his intended victim, there is only preparation, and not an attempt."  *Rains*, 53 Mont. at 428, 164 P. at 542.  (Emphasis added.)  A jury could conclude from this record that, "at least some appreciable fragment of the crime [was] committed, and it [was] in such progress that it [would] be consummated unless interrupted by circumstances independent of the will of the attempter."  *State v. Ribera*, 183 Mont. 1, 11, 597 P.2d 1164, 1170 (1979) (quoting *Rains*, 53 Mont. at 426, 164 P. at 541).

¶44    Boyd's actions are distinct from the defendant in *Rains* who had a stockpile of weapons but had not moved to use any specific weapon against his victim.  *Rains*, 53 Mont. at 429, 164 P. at 542.  We found that the State did not present evidence that any of the stockpiled weapons were "actually used in any effort to accomplish the alleged design."  *Rains*, 53 Mont. at 427, 164 P. at 542.  We found the details of the charge were "mutually exclusive," and "unconnected with any accomplishment of the main purpose."  *Rains*, 53

23

Mont. at 429, 164 P. at 542. In contrast to *Rains*, there was no break in the sequence between Boyd leaving the altercation with Nelson, going to his apartment across the street, retrieving a knife, concealing it, exiting his apartment, and heading in the direction of Nelson with the knife. Every detail could fairly be connected to accomplishment of the main purpose of committing a homicide. Boyd may not have made it all the way down the stairs and across the street, or even started down the stairs at all, but he was headed in the direction of Nelson with a knife concealed in his pants after telling Nelson he would return for his "one shot," which included killing Nelson. The jury could have fairly found Boyd's actions to go beyond simply "stepping outside with a knife in his pants," Opinion, ¶ 22, and "far enough towards the accomplishment of the desired result to amount to commencement of the consummation" of the offense of deliberate homicide. *State v. Colburn*, 2016 MT 246, ¶ 11, 385 Mont. 100, 386 P.3d 561.

¶45 At trial, the defense relied on Boyd being "called down" by Nelson to argue an overt act had not been proven. As Boyd's defense attorney stated in closing argument: "Going up to the apartment and grabbing the knife but without coming down until he was called back down is not an overt act." This is the conclusion the Court draws from its interpretation of the evidence. However, from this record, the jury was also entitled to draw a different conclusion—that Boyd was moving toward Nelson to accomplish his homicidal intent, expressed by him in various ways, and his efforts were interfered with by Ketchum's arrival.

¶46 In my view, the record contains evidence that is subtle and nuanced, and is not as "straightforward" as the Court sees it. Opinion, ¶ 16. After probing the record for evidence to support the jury's guilty verdict, as we are required to do, I would hold that there was sufficient evidence for a rational juror to find support for each element of the offense of attempted deliberate homicide beyond a reasonable doubt, and therefore would affirm Boyd's conviction.

/S/ JIM RICE