No. 04-264

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 200

STATE OF MONTANA,

        Plaintiff and Respondent,

  v.

THOMAS MICHAEL KELLEY,

        Defendant and Appellant.


APPEAL FROM:     District Court of the Eighth Judicial District,
                     In and for the County of Cascade, Cause No. CDC 2003-434
                     The Honorable Kenneth R. Neill, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

                Chad Wright, Appellate Defender Office, Helena, Montana

        For Respondent:

                Hon. Mike McGrath, Montana Attorney General, Joslyn M. Hunt, Assistant Attorney General, Helena, Montana; Brant S. Light, Cascade County Attorney, Marty Judnich, Deputy County Attorney, Great Falls, Montana


                       Submitted on Briefs: May 25, 2005

                            Decided: August 16, 2005

Filed:

 

_____
                            Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      Thomas Michael Kelley (Kelley) appeals from the judgment entered by the District Court of the Eighth Judicial District, Cascade County, upon a jury verdict finding him guilty of theft, criminal possession of dangerous drugs, and criminal possession of drug paraphernalia. We affirm. The sole issue on appeal is whether the evidence presented at trial was sufficient to sustain Kelley's conviction for the offense of theft.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      Jack's Pet Center is co-owned by Sandra Schubarth (Sandra) and her mother, Ellen Fay Schubarth (Ellen), and is located in Great Falls. In the early morning hours of September 6, 2003, the store was burglarized. Officer Bruce McDermott (McDermott), of the Great Falls Police Department, responded to a call regarding the break-in. He arrived at the store at approximately 4:20 a.m., and discovered that a window had been broken, leaving a large opening adjacent to the sidewalk. Upon Sandra's arrival at the store that morning, she discovered that a male Chihuahua puppy and a female Doberman pinscher puppy were missing, along with approximately $2,700 in cash.

¶3      McDermott and one other officer collected fingerprints from the broken glass. The officers also dusted for fingerprints on various surfaces inside the store. The only fingerprints found were on the glass, and none of these were ever matched to Kelley. The officers also found a footprint in the broken glass on the floor. However, none of the footwear later examined in Kelley's apartment matched this footprint.

2

¶4　Dean Mayberry (Mayberry) lived in the same apartment complex as Kelley, and the two were acquaintances. At approximately 6:30 p.m., on September 6, 2003, Mayberry spoke with Kelley at Kelley's apartment. During the conversation, Mayberry noticed a Chihuahua puppy and a Doberman puppy in Kelley's apartment. Because Mayberry had previously cared for Kelley's "Blue Healer mix" while Kelley was away, he knew that the puppies were new to the apartment. Mayberry also testified that Kelley showed him a "wad of cash" and offered to buy drinks for both of them. At trial, Kelley denied showing Mayberry any cash. Mayberry declined the invitation to go out drinking, and returned to his apartment where he later heard about the pet store break-in on the evening news. Upon hearing the news report, Mayberry called law enforcement to report what he had seen at Kelley's apartment.

¶5　Later that evening, McDermott met Mayberry at the apartment complex and they knocked on Kelley's door. There was no answer, but they did hear dogs whimpering inside. Mayberry then took McDermott to a common access laundry room where they were able to look into Kelley's apartment through a screen window. In doing so, they saw Kelley's "Blue Healer" and two puppies matching the description which Sandra had given McDermott earlier that day. McDermott then called Officer Doug Mahlum (Mahlum) and one other officer to secure the scene while he left to obtain a search warrant.

¶6　Before McDermott returned, Kelley arrived at the apartment. The officers took him into custody and Mirandized him. Kelley appeared intoxicated, but was cooperative. When

3

McDermott returned with a search warrant, Kelley consented to the search, stating that he had nothing to hide. He also agreed to speak with the officers and admitted that the puppies were in the apartment. Further, he stated that he had been by the pet store and had seen the broken window. However, he denied entering the store, and claimed to have found the puppies on the street. Upon questioning by McDermott, Kelley stated that there was no other stolen property from the pet store in his apartment. He also told the officers that they would not find any money therein.

¶7    Kelley was then taken from the apartment and interviewed by Mahlum. During this interview, Kelley again claimed to have been at the pet store and seen the broken window, but maintained that he did not enter the store. Again, he claimed to have found the puppies on the street. When Mahlum learned that the other officers had found money in Kelley's apartment, he questioned Kelley on that point. Kelley claimed that he won the money in Reno. Finally, Mahlum observed that Kelley had cuts on his hands. Kelley claimed to have received the cuts during a fight.

¶8    The search of Kelley's apartment yielded the two puppies and approximately $1,400 in cash, which included thirty-four two-dollar bills and one wheat penny. Additionally, officers found cigarette rolling papers, a partially smoked marijuana cigarette, some burnt marijuana on the kitchen table, and a small amount of marijuana in a bag.

¶9    On September 18, 2003, the State filed an Information charging Kelley with one count of criminal mischief in violation of § 45-6-101, MCA, one count of burglary in violation of

4

§ 45-6-204, MCA, one count of criminal possession of dangerous drugs in violation of § 45-9-102, MCA, and one count of criminal possession of drug paraphernalia in violation of § 45-10-103, MCA. Additionally, the Information charged Kelley with one count of theft in violation of § 45-6-301, MCA. While this statute contains several sub-sections, each of which constitutes a distinct offense, the Information did not cite to any particular sub-section. However, the language of the theft charge specifically outlined an alleged violation of § 45-6-301(1)(a), MCA. Hence, Kelley was effectively charged with one count of theft in violation of § 45-6-301(1)(a), MCA. Kelley pled not guilty to all charges.

¶10    At trial, Sandra positively identified the puppies found in Kelley's apartment as the same animals that were taken from the pet store. Sandra testified that Ellen had a collection of thirty-six two-dollar bills in the store's cash register at the time of the incident. Ellen testified that she also had her collection of ten to twelve wheat pennies in the cash register. A copy of each of the thirty-four two-dollar bills found in Kelley's apartment was entered into evidence. Two of these bills were distinct from the others in that they contained the number 2 on the front left side where all the others contained the traditional "Federal Reserve Bank" circular seal. Sandra and Ellen referred to this kind of bill as a "silver certificate," and testified that Ellen's collection contained two such bills. Additionally, Sandra and Ellen positively identified, as a part of Ellen's collection, two traditional two-dollar bills taken from Kelley's apartment. One of these contained a torn corner and the handwritten words "Good Luck," and the other was marked by handwritten scribbling.

5

¶11 Kelley testified in his own defense. While he did not contest the evidence that he possessed marijuana and drug paraphernalia, he did deny breaking into the pet store, and offered a new explanation as to how he obtained the puppies. He claimed to have purchased them from Eric Waldenberg and a woman named Mona, whose last name he did not know. As a part of this explanation, Kelley testified that the purchase occurred at the Triple Crown Motel, and that he then took the Chihuahua into the bar at the Motel. While at the bar, Kelley spoke with Scott Merry (Merry), a bartender. Merry testified that Kelley tried to sell him a "little brown dog." Kelley, however, claimed that he did not try to sell any dog, and testified that he only told Merry he had recently purchased the Chihuahua.

¶12 Pursuant to his new explanation as to how he obtained the puppies, Kelley testified that he had lied to the police officers about finding the puppies on the street because he "didn't want to go ratting Eric and Mona out," but preferred to deal with them personally. Further, Kelley suggested that his intoxication played some role in his decision not to implicate Mona and Waldenberg initially.

¶13 As he had claimed in the interview with Mahlum, Kelley testified that the money found in his apartment belonged to him. Further, Kelley's common law wife testified that Kelley had $2,000 in cash during the early part of August, 2003, $800 of which belonged to her. Kelley also testified that the wheat penney found in his apartment belonged to him and was his "lucky penny." As for his possession of the two-dollar bills, Kelley conceded that they were stolen from the pet store, but testified that he received twenty-five two-dollar bills

6

in change when he purchased the dogs from Waldenberg and Mona. Further, Kelley testified that he asked for and received nine or ten more two-dollar bills in exchange for a twenty-dollar bill, because "[y]ou don't see them that often anymore."

¶14 Finally, McDermott testified, upon questioning by Kelley's counsel, that in September and October of 2003, Great Falls had experienced a rash of break-ins at businesses in the downtown area. McDermott testified that Eric Waldenberg had been arrested in connection with these crimes. However, McDermott testified that he did not determine whether Waldenberg's shoes matched the footprint in the broken glass at the pet store, nor did he discuss the incident with Waldenberg.

¶15 The jury found Kelley guilty of theft, possession of dangerous drugs, and possession of drug paraphernalia, but found him not guilty of burglary and criminal mischief. The District Court sentenced Kelley to serve 10 years pursuant to his theft conviction, six months pursuant to his conviction for possession of dangerous drugs, and six months pursuant to his conviction for possession of drug paraphernalia, with all sentences to run concurrently. The District Court also specified that Kelley would not be eligible for parole, citing his extensive criminal history spanning several states and Canadian provinces, his use of numerous aliases, and the high likelihood of further criminal activity, among other factors.

¶16 Kelley filed notice of appeal, and the District Court ordered that an attorney assigned by the Montana Appellate Defender Office represent him on appeal. Kelley now challenges

only his theft conviction, arguing that the State's evidence was insufficient to support the verdict.

## STANDARD OF REVIEW

¶17    The standard of review of the sufficiency of evidence to sustain a conviction is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McCarthy*, 2004 MT 312, ¶ 46, 324 Mont. 1, ¶ 46, 101 P.3d 288, ¶ 46.

## DISCUSSION

¶18    Kelley's arguments focus on the substance of the evidence presented at trial, and on the effect of his acquittal of the charges of criminal mischief and burglary. The State urges this Court to defer to the jury's finding that the prosecution proved every element of theft beyond a reasonable doubt.

¶19    In assailing the substance of the State's evidence, Kelley notes that he was charged with the offense of theft under § 45-6-301(1)(a), MCA, which contemplates "actual taking" rather than mere possession of stolen property. Thus, Kelley argues that the State, pursuant to its theory that Kelley acted alone, had to demonstrate that he entered the pet store and personally removed the property at issue therefrom in order to demonstrate "actual taking." Other than his mere possession of the stolen property, Kelley asserts, the State failed to present any evidence placing him at the scene of the theft and, more importantly, the State failed to present any evidence that he actually took the stolen property from the pet store.

8

Kelley claims it was precisely this lack of evidence which provided the basis for his acquittal of the charges of criminal mischief and burglary. The evidence of possession, Kelley argues, does not in any way prove that he acquired the stolen property through an "actual taking," and was insufficient for conviction because possession of stolen property standing alone may be as consistent with innocence as with guilt. Finally, Kelley notes that he was not charged with mere possession of stolen property, and the commission of one theft offense does not make a defendant responsible for other offenses outlined in the theft statute. Thus, Kelley argues, the State's evidence was insufficient to support a conviction under § 45-6-301(1)(a), MCA, even when viewed in a light most favorable to the prosecution.

¶20 Kelley correctly notes that the offense of theft under § 45-6-301(1)(a), MCA, contemplates "actual taking" rather than mere possession of stolen property. *State v. Lamere* (1983), 202 Mont. 313, 318-19, 658 P.2d 376, 379. Kelley also correctly notes that evidence of possession of stolen property, standing alone, may be as consistent with innocence as with guilt. *State v. Kramp* (1982), 200 Mont. 383, 396, 651 P.2d 614, 621. However, the evidence that Kelley possessed the stolen property did not stand alone. The trial record contradicts Kelley's claim that the State presented no other evidence demonstrating that he actually removed the stolen property from within the pet store. The record also contradicts Kelley's claim that the State presented no evidence placing him at the scene of the theft.

¶21 First, we observe that Kelley admitted to police officers that he was at the pet store, that he had seen the broken window, and that he found the dogs on the street near the store.

9

The jury apparently found this evidence persuasive, given their determination that the State proved every element of theft beyond a reasonable doubt. Such evidence, while not conclusive in and of itself, placed Kelley at the scene of the theft and provided, in part, a basis for a finding that he entered the store and removed the property at issue. The evidence of possession, while also not conclusive in and of itself, provided further grounds for such a finding. As we have held, unauthorized control or possession of property belonging to another is a circumstance from which the jury may draw an inference and find that the person in possession committed the theft of the property, if such an inference is warranted by the evidence as a whole. *Kramp*, 200 Mont. at 397, 651 P.2d at 621-22. Moreover, it is within the exclusive province of the jury to determine whether the facts and circumstances shown by the evidence warrant such an inference. *Kramp*, 200 Mont. at 397, 651 P.2d at 622. Thus, we must reject Kelley's contention that the evidence of his possession of the stolen property "does not in any way prove that Kelley acquired those items through an 'actual taking.'"

¶22  When a defendant takes the witness stand to explain his or her possession of property belonging to another, the weight to be attached to this explanation is exclusively for the jury to determine. *Kramp*, 200 Mont. at 397, 651 P.2d at 622. Further, a jury is at liberty to believe all, a part of, or none of the testimony of any witness. *State v. Taylor* (1973), 163 Mont. 106, 116, 515 P.2d 695, 701. Thus, the fact that Kelley later provided a different account of the circumstances surrounding his acquisition of the stolen property, did not preclude the jury from accepting that part of his initial explanation which placed him at the

10

scene of the theft. Because this second explanation was inconsistent with his first explanation, and was directly contradicted by the testimony of other witnesses, the jury had to consider conflicting evidence in rendering their verdict. As we have held, the credibility of witnesses is exclusively the province of the trier of fact and, in the event of conflicting evidence, it is within the province of the trier of fact to determine which will prevail. *State v. Bailey*, 2003 MT 150, ¶ 13, 316 Mont. 211, ¶ 13, 70 P.3d 1231, ¶ 13. In cases where we consider the sufficiency of the evidence, we will not substitute our judgment for that of the jury, which is able to view firsthand the evidence presented, observe the demeanor of the witnesses, and weigh the credibility of each party. *State v. Azure*, 2002 MT 22, ¶ 48, 308 Mont. 201, ¶ 48, 41 P.3d 899, ¶ 48.

¶23 Kelley's arguments regarding the substance of the State's evidence are not persuasive. While the trial record does not disclose an overwhelming amount of direct evidence demonstrating that he obtained the stolen items by entry into the pet store, the jury nonetheless found that the prosecution proved every element of theft as defined in § 45-6-301(1)(a), MCA. This verdict, when considered in light of the evidence presented at trial, contains an implicit finding that Kelley did in fact enter the store to obtain the property at issue. Our review of the evidence, as noted above, must be conducted with a high level of deference to the jury's findings. Having conducted this review, we conclude that the evidence presented at trial, when viewed in the light most favorable to the prosecution, would

11

allow any rational trier of fact to find the essential elements of theft beyond a reasonable doubt. Thus, we conclude that the evidence was sufficient to sustain Kelley's conviction.

¶24 We now turn to Kelley's arguments regarding the implications of his acquittal of the charges of criminal mischief and burglary. Kelley argues that these acquittals demonstrate the insufficiency of the evidence underlying his theft conviction. In support of this argument Kelley asserts that because he was the sole alleged perpetrator under the State's theory, "the theft could not be divorced from the burglary and criminal mischief," and thus he could not be found guilty of the theft and not guilty of the other charges. Kelley also argues that the acquittals established the "fact" that he did not enter the pet store, and thereby "had the effect of negating participation in the theft," since no "actual taking" could have been accomplished without entry into the store. Pursuant to these arguments, Kelley asserts that no reasonable jury could find that he actually took the stolen property from the store.

¶25 We have previously addressed similar arguments. For example, in *Bailey*, the defendant was charged with robbery, theft, and assault with a weapon. *Bailey*, ¶ 3. Each of these charges arose from the same incident. *Bailey*, ¶¶ 3-5. Bailey was convicted of robbery and theft, but acquitted of assault with a weapon. *Bailey*, ¶ 6. On appeal, Bailey argued that the State failed to provide sufficient evidence supporting the robbery conviction because the jury acquitted him of assault with a weapon. *Bailey*, ¶ 8. Pursuant to this argument, Bailey claimed that it was inconsistent for the jury to convict him of robbery and acquit him of assault based on the same evidence. *Bailey*, ¶ 10. We found Bailey's arguments

12

unpersuasive and therefore upheld his conviction. *Bailey*, ¶ 14. In doing so, we determined that the jury's verdicts were not necessarily inconsistent, but also went on to explain that as a general principle of law, consistency in criminal verdicts is unnecessary. *Bailey*, ¶ 12 (citing *State v. Fitzpatrick* (1977), 174 Mont. 174, 191, 569 P.2d 383, 395; *Dunn v. United States* (1932), 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356).

¶26 This Court has long adhered to this general principle of law. As we stated in *State v. Daly* (1926), 77 Mont. 387, 392, 250 P. 976, 977-78, it is permissible for a jury to convict on one count and to acquit on another, where it is also within their province to convict on both counts on the same evidence. Similarly, and more recently, we have held that where separate acts are charged in an information, and each act is a separate offense, an acquittal or conviction of one or more counts does not affect the other counts. *Azure*, ¶ 48. This principle was even announced in the jury instructions in this case, which provided:

> Each count charges a distinct offense. You must decide each count separately. The Defendant may be found guilty or not guilty of any or all of the offenses charged.

¶27 Accordingly, we reject Kelley's contention that his acquittal of criminal mischief and burglary "had the effect of negating participation in the theft." Similarly, we reject Kelley's contention that he could not be found guilty of the theft while also being found not guilty of the other charges because the theft could not be divorced from the other charges. Furthermore, we observe that these arguments must fail upon the recognition that the offenses charged in this case were statutorily distinct, each being comprised of different

13

elements. Section 45-6-101, MCA, specifies that a person commits the offense of criminal mischief if the person knowingly or purposely injures, damages, or destroys any property of another or public property without consent. Section 45-6-204, MCA, specifies that a person commits the offense of burglary if the person knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein. Finally, § 45-6-301(1)(a), MCA, specifies that a person commits the offense of theft when the person purposely or knowingly obtains or exerts unauthorized control over property of the owner and has the purpose of depriving the owner of the property. The distinct nature of each offense was not rendered inconsequential merely because the State alleged a course of conduct wherein all Kelley's actions were connected in furtherance of the theft. Thus, the State was not required to prove criminal mischief or burglary, or any element thereof, in order to obtain a conviction for theft.

¶28 Kelley has not cited to authority for his assertion that the acquittals established the "fact" that he did not enter the store. Moreover, an examination of the verdict form and the instructions demonstrates the fallacy of this assertion. The verdict was rendered pursuant to a set of instructions and a verdict form which allowed the jury to state *only* whether the prosecution had proven every element of the charged offenses beyond a reasonable doubt. Thus, the acquittals established nothing more than the fact that the State failed to prove at least one element of criminal mischief and burglary. This failure does not affirmatively establish any particular fact regarding Kelley's conduct, as the acquittals merely represent

14

the jury's conclusion as to the sufficiency of the State's proof. A failure to prove each element of a charged offense is simply that--a failure of proof. The acquittal resulting from such failure can not be considered tantamount to an affirmative proposition that Kelley did or did not engage in any particular act. Consequently, we must reject Kelley's assertion that the acquittals established the "fact" that he did not enter the store.

¶29 We find Kelley's arguments unpersuasive, as he has misconstrued the implications of his acquittals of the charges of criminal mischief and burglary. The acquittals do not establish that he did not enter the pet store. Nor do the acquittals establish that he did not participate in the theft. Furthermore, the theft charge was not inseparable from the other charges, and the acquittals did not preclude a conviction for theft. As such, we conclude that the acquittals do not demonstrate an insufficiency in the evidence supporting Kelley's theft conviction.

**CONCLUSION**

¶30 We have reviewed the substance of the evidence in the light most favorable to the prosecution, and have concluded that any rational trier of fact could have found the essential elements of theft beyond a reasonable doubt. As such we have concluded that the evidence was sufficient to sustain Kelley's conviction. We have also considered Kelley's contentions regarding the effect of his acquittals, and have found these arguments unpersuasive.

15

¶31 Accordingly, Kelley's conviction is affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS