FILED

07/30/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0604

DA 20-0604

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 157

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

PRESTON CSOO ROSSBACH,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 18-645
Honorable Leslie Halligan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Kristina L. Neal, Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Tammy K Plubell, Assistant Attorney General, Helena, Montana

            Kirsten Pabst, Missoula County Attorney, Mat Jennings, Deputy County Attorney, Missoula, Montana

Submitted on Briefs: April 17, 2024
Decided: July 30, 2024

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 A Missoula County jury convicted Preston Csoo Rossbach of assault with a weapon, tampering with evidence, two counts of intimidation, and two counts of deliberate homicide. He appeals, claiming that the Fourth Judicial District Court erred when it denied his motion for acquittal or, in the alternative, for a new trial. We consider the following issues on appeal:

> *1. Whether the District Court erred when it denied Rossbach's challenge for cause of Prospective Juror C.S.?*
>
> *2. Whether the District Court violated Rossbach's fundamental right to confront witnesses when it limited the scope of his cross-examination of jailhouse informants?*
>
> *3. Whether the State presented evidence sufficient to convict Rossbach of deliberate homicide on a theory of felony murder?*
>
> *4. Whether the District Court erred when it denied Rossbach's motion for a new trial based on* Brady *violations?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Law enforcement officers and emergency medical personnel responded to a downtown Missoula motel room in October of 2018 following a report of a possible assault. At the scene, they discovered Kaleb Williams injured on a bed and both Megan McLaughlin and Jason Flink deceased. All three of the room occupants had been shot; Flink and Williams also suffered cut and puncture wounds. Trial evidence established the sequence of events.

¶3 On the evening of October 18, 2018, Rossbach, Jonathan Whitworth, and Ty Butler drove a work truck away from a stone cabin they lived in near Lolo, stopped at a restaurant, then drove on to Missoula. Whitworth made arrangements that evening with Josiah Senecal to buy methamphetamine from Senecal and LaBenza Charlo, Senecal's girlfriend, who "middled" (arranged) drug deals between buyers and dealers. When the men in the vehicle arrived at the residence where Senecal and Charlo lived, Senecal went out to the truck to deliver the drugs to Whitworth. At the behest of at least Whitworth, Senecal went back inside the residence at least two times to talk Charlo into coming out and getting into the truck with the men, which she eventually did. Whitworth told Senecal and Charlo that the drugs they had previously middled for him from Raven Lamere had been "bad" and had put Rossbach's brother in the hospital. Charlo agreed to go with Whitworth and the other men to the downtown motel where Lamere was staying. Although she personally did not have a specific plan in mind, Charlo wanted to talk to Lamere to "make it right."

¶4 Charlo testified that on the drive to the motel, Whitworth seemed as if he had "a problem" and that "something was not right." Whitworth appeared hostile, angry, and upset and acted "crazy" and "threatening." Charlo felt uncomfortable as Whitworth played a rap song on his phone and sang along to the lyrics, which talked about "riding for your clique . . . don't snitch."[1]

¶5 At approximately 12:45 a.m. on October 19, 2018, the truck arrived at the motel and parked in the alley. The occupants of the truck discussed who would go upstairs to

---

[1] Whitworth played the song "Mando" by $tupid Young, which references drugs and gang culture.

Lamere's room; it was determined that Charlo, not Senecal, would accompany Rossbach and Whitworth. A few minutes later, Rossbach, Whitworth, and Charlo made their way to Lamere's room. Whitworth carried a gun. McLaughlin opened the door and let them into the room where Flink was present, along with Williams, who was sleeping on the bed. Charlo testified she knew McLaughlin as a friend of Lamere. Lamere was not there but had left to go to the store. Charlo asked McLaughlin and Flink if they had meth and was told they did not but were waiting for Lamere to return. Rossbach, Whitworth, and Charlo left the room and the door closed behind them, but they remained in the hallway.

¶6 Less than two minutes later, Whitworth told Charlo to knock on the door again. When asked at trial if she had thought a robbery might occur, Charlo testified, "[M]aybe a little bit, but I didn't think they were gonna kill them."

¶7 McLaughlin opened the door a second time and Rossbach, Whitworth, and Charlo followed her into the room again. After McLaughlin sat down, Charlo asked McLaughlin and Flink if either of them had personal-use meth. Both again denied having meth, but Flink offered his dab pen. Either Whitworth or Rossbach responded with a profanity. Whitworth pulled out the gun and shot several times at McLaughlin, Flink, and Williams. Charlo ducked and ran, crouched near the door, closed her eyes and covered her ears, unaware of Rossbach's actions. An informant for the State would later testify that Rossbach told him that Rossbach directed Whitworth to shoot.

¶8 After the shooting, Whitworth ran by Charlo, telling her, "Let's go." An object that Charlo did not identify dropped on the floor and Whitworth told her to pick it up, then to

4

leave it. Charlo and Whitworth ran out of the room and Rossbach exited the room several seconds later, carrying an object in his hand. Soon thereafter the truck carrying Rossbach, Whitworth, Charlo, Senecal, and Butler pulled away from the motel.

¶9 On the way back to the residence where Charlo and Senecal lived, Rossbach and Whitworth talked. Charlo heard Rossbach say, "No witnesses" as he discussed with Whitworth whether they should kill Charlo and Senecal. At the residence, the truck occupants stayed in the vehicle for a few moments. Rossbach displayed his "O4L" (Outlaws for Life) arm tattoo and Whitworth stated, "You earned that shit, Bro." Rossbach pressed his seatback into Charlo's legs and put a knife into her and Senecal's faces, telling them that they "didn't see anything." Senecal asked what was going on and Rossbach told him to shut up. Whitworth asked Senecal if he knew what they did in the motel room; Senecal testified that at that time he had a good idea of what had happened but denied it when responding to Whitworth. Senecal told Whitworth that he and Rossbach were scaring Charlo; Whitworth nodded at Rossbach, who pulled the seatback up off Charlo's legs.

¶10 Whitworth then told Senecal to stay in the truck with Rossbach and Butler. He accompanied Charlo inside the residence, stating that he had to use the bathroom. Charlo testified that once inside, Whitworth did not use the bathroom, but "scoped" out the residence, leading her to believe he might shoot her, but that he left when he saw others in the home.

¶11 Law enforcement later arrived at the Lolo cabin, and eventually questioned Rossbach, Whitworth, Butler, and several other people staying at the cabin. Law

5

enforcement found Rossbach's and Whitworth's clothing and a knife in a sheath hidden on the Lolo property; Whitworth's gun was never found. Rossbach was later arrested and charged with multiple offenses related to the night's events.

¶12 In early March of 2020, Rossbach was tried by a jury on the State's amended Information. During voir dire, the prosecutor and defense counsel discussed with the prospective jurors their thoughts on witness testimony when a witness had been provided an incentive to testify. Defense counsel moved to remove Prospective Juror C.S. (C.S.) for cause based on his responses. The District Court denied the motion. Defense counsel subsequently used one of the defense's six peremptory challenges to remove C.S., and the defense eventually exhausted its remaining peremptory challenges.

¶13 During the trial, the jury heard testimony from multiple witnesses, including Butler, Senecal, and Charlo, who provided her testimony under an immunity agreement with the State. Williams testified about waking up in the motel room bleeding and in pain and seeing a person with "bushy hair" standing at the foot of his bed.

¶14 Law enforcement witnesses testified to the drug paraphernalia, purses, and credit cards found in the motel room after the incident. Flink's mother testified that a watch that Flink "always" wore, including on the night of the killings, had not been found after he was killed.

¶15 Forensics experts testified regarding security camera video footage, blood and DNA evidence from the motel room, and blood and DNA evidence from Rossbach's and Whitworth's clothing and the knife and sheath.

6

¶16 Two witnesses incarcerated in detention facilities with Rossbach after he was charged also testified; on the last day of the trial, the prosecutor disclosed to defense counsel and the District Court a letter written by one of the informants related to another unrelated criminal investigation.

¶17 After eight days of trial and jury deliberation, the jury convicted Rossbach of two counts of deliberate homicide (felony murder)[2] for the deaths of McLaughlin and Flink, one count of assault with a weapon[3] for the bodily injuries to Williams, one count of tampering with evidence[4] based on removal of the knife from the motel, and two counts of intimidation[5] based on his threats towards Charlo and Senecal. The District Court sentenced Rossbach to sixty years with ten years suspended for the deliberate homicide convictions and imposed prison terms for each of the other convictions, all sentences to run concurrently. On April 13, 2020, Rossbach filed a Motion for Judgment Notwithstanding the Verdict asking for acquittal, or in the alternative, Motion for New Trial. The District Court entered an Order Denying Defendant's Post-Trial Motions on September 3, 2020. Rossbach appeals.

¶18 We discuss additional facts below as they relate to the issues on appeal.

---

[2] Section 45-5-102, MCA

[3] Section 45-5-213, MCA.

[4] Section 45-7-207, MCA.

[5] Section 45-5-203, MCA.

¶19 "We review a district court's denial of a challenge to remove a prospective juror for cause for an abuse of discretion." *State v. Ghostbear,* 2020 MT 60, ¶ 8, 399 Mont. 208, 459 P.3d 1285 (citations omitted).

¶20 "We review a district court's evidentiary rulings for abuse of discretion." *State v. Garding,* 2013 MT 355, ¶ 18, 373 Mont. 16, 315 P.3d 912 (citations omitted).

¶21 We review de novo the sufficiency of evidence to convict a defendant. *State v. Boyd,* 2021 MT 323, ¶ 12, 407 Mont. 1, 501 P.3d 409 (citations omitted). "The standard of review of sufficiency of the evidence on appeal is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Boyd*, ¶ 12 (internal quotations and citations omitted).

¶22 Our review of constitutional questions, including alleged *Brady* violations, is plenary. *State v. Jackson*, 2009 MT 427, ¶ 50, 354 Mont. 63, 221 P.3d 1213 (citation omitted).

**DISCUSSION**

¶23 *1. Whether the District Court erred when it denied Rossbach's challenge for cause of Prospective Juror C.S.?*

¶24 A criminal defendant has a state and federal constitutional right to an impartial jury. *Ghostbear*, ¶ 10 (citations omitted). Section 46-16-115, MCA, protects this right by providing each party opportunity to challenge a juror for cause if the juror has a "state of mind in reference to the case or to either of the parties that would prevent the juror from

8

acting with entire impartiality and without prejudice to the substantial rights of either party." Courts assess a juror's state of mind by considering whether the juror's statements "express[] fixed opinions" or "raise serious questions as to potential bias." *State v. Calahan,* 2023 MT 219, ¶ 22, 414 Mont. 71, 538 P.3d 1129 (citing *State v. Johnson,* 2014 MT 11, ¶ 10, 373 Mont. 330, 317 P.3d 164). We place emphasis on a juror's "spontaneous, and usually initial" statements. *Calahan*, ¶ 22 (citation omitted). But we consider the totality of the circumstances when making determinations about a juror's state of mind. *Calahan*, ¶ 22 (citation omitted). "[W]e give deference to a district court's determination regarding a challenge for cause." *Johnson,* ¶ 20 (citation omitted)*.*

¶25 Rossbach contends that the District Court should have removed Juror C.S. for cause, forcing him to use a peremptory challenge and thereby exhausting his available peremptory challenges. Rossbach asserts that C.S.'s initial responses during voir dire demonstrated that he would afford more credibility to witnesses who were provided incentives by the State than to defense witnesses, thus disallowing him to be impartial. Rossbach also argues that C.S.'s later voir dire responses, in which he asserted his impartiality, were disingenuous and prompted by rehabilitative coaxing by the State and the District Court.

¶26 C.S.'s initial responses occurred during the prosecutor's conversations with numerous prospective jurors regarding whether they would be willing to consider testimony from witnesses given a "deal from the government[.]" The prosecutor questioned whether prospective jurors would be "skeptical" of testimony from witnesses offered a "cooperation agreement or immunity[]" by the State. The prosecutor conversed

9

with several prospective jurors along this line of inquiry and at one point stated that she wanted to know if any of them could hear State witnesses provided "immunity or deals" and be unable, for that reason, to take their testimony into consideration. The prosecutor asked C.S. his thoughts on the topic and he responded by stating, "[I]t wouldn't affect me, as far as what I thought of them. I'd want their information. . . . I'm gonna assume that the State did its due diligence . . . so that I can rely on what that person's saying."

¶27 Defense counsel explored this initial statement to determine if C.S.'s assumption that the State would call credible witnesses indicated bias or whether he would have assumed the same credibility of Rossbach's witnesses. Rossbach argues that C.S.'s responses demonstrated that he would continue to give credence to State witnesses but would not assume the testimony of a defense witness to be credible in the same way. Rossbach contends this "one-sided belief" in the State's witnesses over Rossbach's created a serious question about C.S.'s ability to be fair and impartial that required removal for cause.

¶28 Defense counsel, in continuing the State's conversation about incentivized witnesses, posed to the prospective jurors questions about a witness's credibility if defense counsel provided "a million dollars" to that witness to testify. The first prospective juror to be asked that hypothetical responded as follows:

> Prospective Juror R.P. (R.P.): [H]e got bought? Sure. He's worth a million dollars.
>
> Defense counsel: How would you factor that into his credibility? I mean, what would you look at and would that - -

R.P.: I would question everything that he had to say or she had to say and how much he or she got paid to say it.

Defense counsel: Because we talked about this a little bit earlier, right? But it was a little different. The example given earlier was the State gave a witness an incentive to testify. Would you view that witness with the same caution?

R.P.: Well, no. 'Cause the other side of it is they could've also given the witness freedom to testify.

Defense counsel: Yeah. So say, for example, they say, Man, you were looking at 20 years in prison but you're gonna get probation.

R.P.: To tell the truth, supposedly.

Defense counsel: And so that's the question: Would you view them with the same caution that you would view the witness that I called?

R.P.: No, because they're not - - they don't equate.

Defense counsel: Okay. What's different between those things?

R.P.: A million dollars on one hand, and 20 years of freedom on the other.

Defense counsel: Which is more valuable?

R.P.: Depends on the person. I mean, this whole thing is all dependent upon the person.

¶29 At this point, R.P.'s responses demonstrated that two different scenarios were in play: a lawful plea agreement offered for a witness's testimony, versus an illicit payment ("he got bought") of a million dollars offered for a witness's testimony. And it is upon these two different scenarios that C.S.'s later responses were based.

¶30 Asked by defense counsel to confirm his previous statement that if the State offered leniency to a witness for testimony, he would assume the State did its due diligence, C.S.

11

agreed, indicating that he could not be convinced that the State would take "20 years off" a sentence for the witness just to say "something" without the State checking out the story. When asked if he would view the State's offer to a witness as an indication that the witness was more likely telling the truth, C.S. replied that he couldn't "say for sure" because "they're getting something out of this." He then said, "[I]t would be different for me if, say, you made [the million dollar] deal. . . . I would question that way faster than I would question something coming from the State." When defense counsel asked why, C.S. replied, "[F]or all I know, you didn't do anything to back up . . . what that person's saying. . . . Where I would assume that the State would be checking . . . that out before offering any kind of a deal." He then stated that while he would not look at what the deal was but would "expect or at least hope" that the State would try to corroborate the witness's story, he would not consider a witness's credibility differently if the witness was given a plea deal or subpoenaed, and that he did not have a bias towards the State.

¶31    Upon defense counsel's continued concern, the District Court asked as follows:

> District Court: [I]s that kind of what you're saying, that if the State offered some leniency in lieu of some testimony given by a witness that you would trust that they made the right decision to do that, to get the witness to come forward, but that if [defense counsel] did the same thing, that you would be concerned that he didn't have the, kind of, wherewithal or the facts to back it up?
>
> C.S.: I didn't say that quite the way I meant it. I would think that you would do the same; that you would try to go and check his story, which I'm assuming you've done since, you know, he's your client. So, yeah, I'm not sure.

12

¶32 The District Court stated that the questioning was not to challenge C.S.'s viewpoint but to ensure impartiality. C.S. replied, "So is the concern that I would favor the State automatically over the defendant?" The District Court said, "I think that is one of the concerns[,]" and C.S. replied, "Okay. Well, that would be, no, I would not." Upon the court's further questioning, C.S. answered that while a plea agreement would be "in the back of [his] mind" and he might consider what prompted the witness to accept a deal, he also would not take the "20 years, whatever, example" into consideration and he would not question the credibility of an incentivized State witness, but also he would not favor the State. Upon these conflicting responses, the District Court allowed the prosecutor to query C.S.:

> Prosecutor: It sounds like to me if the defense did the same thing, if they have some - - and I think their example was monetary, right, because that's maybe what they - - I don't know if they could, but it's not like they can grant people liberty, right? You would - - would you question that the same way, that you just wouldn't question the State? It's not the same.

> C.S.: No. The expectation I would have is that both of you did what you needed to as far as with that stuff. See, I don't know. See, I'm just not sure I'm explaining myself.

> Prosecutor: No, I think so. I mean, what [defense counsel] and maybe the judge understood was that you were saying that: I would think that the defense wouldn't do their due diligence and would potentially - - I would be more critical of that, of their deal with a witness than I would of the State.

¶33 At that point, R.P., the first prospective juror to be questioned on the different hypotheticals, interjected:

> R.P.: That wasn't the hypothetical. The hypothetical was the defense was gonna pay a million dollars to have a person testify to something that was - -

13

testify to a specific thing. And so it's not equivalent to what the - - you left out part of the hypothetical on - -

Prosecutor: You're right; you're right.

R.P.: So that's where he got stuck.

Prosecutor: But I want to know the answer to the question.

R.P.: Sorry; frustration.

The State redirected its inquiry to C.S. as follows:

Prosecutor: [T]here may have been some confusion about what was asked. But what I want to know is, are you going to give the same benefit of the doubt to counsel, [defense counsel] - -

C.S.: Yeah.

Prosecutor: - - that you are to the State?

C.S.: Yes.

¶34 Upon defense counsel's statement of continuing concern, the District Court followed up:

District Court: So perhaps I'll just ask you one more question. So we've had this discussion about different scenarios. Do you think that you could fairly hear the evidence and then assess it to try to determine the facts and then apply it to the law?

C.S.: Yes.

District Court: And you would give the same consideration and attention to [defense counsel] in his questioning and his examination as well as to the State in their questioning and examination?

C.S.: Yes.

The District Court denied defense counsel's challenge for cause.

¶35     Putting C.S.'s responses in full context, the discussion focused on the parties' different hypotheticals. The questioning by the District Court and both counsel was not to coax or rehabilitate the prospective juror to make statements that were not his own, but to clarify the confusion about the questions he was asked and to get to the heart of the intended question whether he would automatically give deference to State witnesses over Rossbach's witnesses. Significantly, C.S. continuously stated throughout the voir dire that he would not favor the State's witnesses over Rossbach's witnesses and also stated that he could fairly consider the evidence to determine the facts and apply the law. The District Court explained in its order denying a new trial that any concerns from C.S.'s responses were dispelled by his clarification and by his

> repeated statement that the knowledge that a witness has an incentive to testify would not make him more credible than a witness who has no incentive to testify and his consistent assertion that he was unbiased and would give the same benefit of the doubt to defense counsel as to the prosecutor.

¶36     The District Court had "the ability to look into the eyes of the juror in question, and to consider [his] responses in the context of the courtroom." *Johnson,* ¶ 20 (internal quotation and citations omitted). In its order denying a new trial, the court stated, "From his answers, the Court has no doubt of his ability to be impartial." Considering the entire context of the voir dire, the District Court did not abuse its discretion when it denied Rossbach's motion to exclude C.S. for cause.

¶37     *2. Whether the District Court violated Rossbach's fundamental right to confront witnesses when it limited the scope of his cross-examination of jailhouse informants?*

15

¶38     The Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution guarantee a defendant's right to confront adverse witnesses. *State v. Nelson,* 2002 MT 122, ¶ 15, 310 Mont. 71, 48 P.3d 739 (citations omitted).  The trial court retains "broad discretion to limit the scope of cross-examination to those issues it determines are relevant to trial." *Nelson,* ¶ 15 (citations omitted).  So "limiting the scope of cross-examination does not necessarily violate a defendant's right to confront an adverse witness." *Nelson,* ¶ 15 (citation omitted).

¶39     We addressed in *Garding* whether the trial court's limitations on the cross-examination of an informant regarding his plea agreement to testify against the defendant violated the defendant's confrontation rights.  The district court allowed Garding to cross-examine the informant, a witness to the offense of which Garding was accused, about unrelated charges the informant faced, the plea agreement the informant entered with the prosecution, and the timing of the informant's statements about Garding.  *Garding,* ¶ 24.  The district court disallowed questioning about the informant's potential designation as a persistent felony offender due to the charges against him, which could potentially increase the penalty against him for those charges.  *Garding,* ¶ 14.  Garding argued that the limitation prevented her from demonstrating the informant's full incentive and bias in testifying against her.  *Garding,* ¶ 20.  We upheld the District Court's exercise of discretion as it had allowed a wide scope of inquiries.  *Garding,* ¶ 24.

¶40     During Rossbach's trial, the jury heard testimony from two informants who professed to have heard from Rossbach while incarcerated about the events for which he

was charged. Informant 1 entered into a cooperation agreement with the State to provide testimony at Rossbach's trial about their conversations. Informant 2 had entered into a similar cooperation agreement with the State about his conversations with Rossbach but then had violated the terms of that agreement, rendering the agreement ineffective by the time of trial. The informants testified that Rossbach stated he had agreed to plan and helped to plan a robbery at the motel with Whitworth for drugs and money. Informant 2 testified that Rossbach told Whitworth to shoot the occupants of the room when they had no drugs, that Rossbach had stabbed Flink and Williams, and that after the shootings Whitworth told Rossbach he could "use" the murders for Rossbach's initiation into the Outlaws for Life gang.

¶41 Rossbach contends that the District Court placed limitations on defense counsel's cross-examination of the informants' criminal histories that severely limited his ability to demonstrate untruthfulness and/or bias. Rossbach contends he was unable to show the seriousness, nature, and "scope of escalated punishment" the informants faced, which violated his right of latitude in attempting to impeach their credibility. Further, Rossbach argues that the State was allowed to ask the informants repeated questions to convince the jury they were "concerned citizens who were only looking out for the good of the community[.]" Rossbach argues that the informants' testimonies were a significant part of, if not the only, evidence that Rossbach participated in a plan for an attempted robbery. He contends that the limits on his cross-examination were particularly prejudicial.

17

¶42 At trial, the District Court allowed inquiries into the informants' prior convictions related to their honesty, about prison time they had served and faced in the future, and about their cooperation agreements with the State. The State questioned Informant 1 about his prior and current incarceration in prison, the potential penalties he faced due to pending charges, his motivation to testify, the risks of acting as an informant, his cooperation agreement, and the potential benefits of the cooperation agreement. Defense counsel questioned Informant 1 about the length of time he had served, and still had to serve, in his current incarceration in prison and that he was "potentially parole eligible" in the same month as Rossbach's trial if no new sentences were imposed. The State questioned Informant 2 about his current incarceration in county jail, pending criminal charges, prior gang activity in prison and risks acting as an informant, "some convictions for not being truthful[,]" the possible penalty he faced on current charges, his violation of the cooperation agreement he had entered with the State, and his hope—but no expectation—that his testimony would be considered beneficial by the State, despite the termination of his cooperation agreement, if he was convicted on his current charges. Defense counsel questioned Informant 2 about his motivations to testify, pending charges and the potential penalties he faced from those charges, and his prior association in prison with gang members who would lie for one another.

¶43 The District Court restricted Rossbach's cross-examination to keep the case focused on the issues without turning it into a trial of the informants' prior crimes. With those limits, the court gave Rossbach wide latitude to explore the informants' motivations and

18

potential biases. The court later observed that the parties' questioning of the informants "exceeded" the restrictions it had imposed on Rossbach's examination of the informants' criminal histories, including specific penalties Informant 2 faced for pending charges. The record demonstrates that Rossbach was afforded an effective opportunity for cross-examination within constitutional bounds. The District Court did not abuse its discretion.

¶44    *3. Whether the State presented evidence sufficient to convict Rossbach of deliberate homicide on a theory of felony murder?*

¶45    Rossbach was convicted of deliberate homicide under Montana's felony-murder statute after the jury found him legally accountable for attempted robbery. A defendant is liable for deliberate homicide if the defendant "attempts to commit, commits, or is *legally accountable* for the attempt or commission of robbery" and "in the course of the [robbery] or flight thereafter, the [defendant] or any person *legally accountable* for the crime causes the death of another human being." Section 45-5-102(1)(b), MCA (emphasis added).

¶46    A criminal defendant can be held legally accountable for another's criminal offense when "either before or during the commission of an offense with the purpose to promote or facilitate the commission, the person solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense." Section 45-2-302(2), (3), MCA.

¶47    A person commits robbery if, while committing a theft, the person purposely or knowingly inflicts bodily injury upon another or purposely or knowingly puts any person in fear of immediate bodily injury. Section 45-5-401, MCA. Theft includes acts that occur

19

in attempt to commit, in the commission of, or in flight after the attempt or commission of theft. Section 45-5-401(3), MCA.

¶48 An individual "commits the offense of attempt when, with the purpose to commit a specific offense, the person does any act toward the commission of the offense." Section 45-4-103(1), MCA. It is no defense to the charge of attempt that "because of a misapprehension of the circumstances, it would have been impossible for the accused to commit the offense attempted." Section 45-4-103(2), MCA. An attempt to commit an offense must consist of more than preparation; the defendant must commit an overt act in furtherance of the offense. *State v. Fish,* 190 Mont. 461, 469, 621 P.2d 1072, 1077 (1980) (citations omitted).

¶49 Rossbach contends that no rational jury could have determined that the State met its burden of proof related to the elements of his conviction for deliberate homicide by felony murder. Rossbach argues that the State failed to prove an attempted robbery because it did not present evidence of a theft or attempted theft and failed to demonstrate any "overt act" in furtherance of an attempted robbery. Rossbach alternatively argues that any attempted robbery concluded when the target of the robbery, Lamere, was not at the motel.

¶50 The State presented evidence at trial that Rossbach and Whitworth picked up Charlo to go to Lamere's motel room to address the "bad" drugs Lamere had previously provided and to "make it right[,]" that in the truck Whitworth was acting threatening and "crazy," that Rossbach directed Charlo to accompany him and Whitworth to Lamere's room, and that Whitworth carried a gun. The State's evidence included that Charlo knew at least one

20

of the occupants of the room as a drug user, that the occupants were waiting for Lamere—a known drug dealer—to return, that Charlo thought a robbery might happen, that Flink's watch was missing after the deaths, and that Rossbach had stated "no witnesses" and threatened Charlo and Senecal with a knife after the shootings.

¶51 Further, Informant 1 testified that Rossbach admitted that he agreed to try to rob Lamere with Whitworth, that they had tried to rob "the wrong person," that Rossbach had been armed with a knife and stabbed Williams, and that Rossbach threatened Charlo with the knife, telling her he would kill her if she told anyone what had happened. In addition, Informant 2 testified that Rossbach admitted he and Whitworth had planned a robbery and that after they left the motel room the first time upon learning Lamere was not there, Rossbach went back into the room. Informant 2 also testified that Rossbach admitted: that he told Whitworth to shoot the victims; that Rossbach stabbed Flink and Williams and searched through their pockets; that Rossbach laid his seatback down and pinned Charlo in the truck after the shootings, telling Whitworth not to leave any witnesses; and that Whitworth went into Charlo's residence with her after the shootings and told Rossbach he didn't shoot her because he was out of bullets and other people were in the residence.

¶52 The State presented circumstantial evidence of a theft or attempted theft, including the testimony regarding Rossbach's action of rifling through the victims' pockets and Flink's missing watch. *See State v. Lantis,* 1998 MT 172, ¶ 46, 289 Mont 480, 962 P.2d 1169 (noting "that circumstantial evidence is sufficient to support a conviction[]" (internal quotation and citations omitted)).

21

¶53 Further, the State presented evidence of Rossbach's "overt" actions towards the commission of the crime beyond mere preparation, not the least of which included arming himself with a knife, entering the motel room with an agreement with Whitworth to commit a robbery, and stabbing Flink and Williams. The State presented "many pieces of evidence which, when considered together, would allow a rational juror to find the essential elements of the charged offense beyond a reasonable doubt." *State v. Ferguson,* 2005 MT 343, ¶ 91, 330 Mont. 103, 126 P.3d 463.

¶54 Rossbach also contends that he cannot be held legally accountable for the offense of attempted robbery under *State v. Kline,* 2016 MT 177, 384 Mont. 157, 376 P.3d 132. In that case, Kline's teenaged daughter admitted to a consensual incestuous relationship for a time with her father, but only the father was charged. *Kline,* ¶ 19. Applying the incest statute, we held that the daughter was responsible for her own "commission of [the crime]," and so she could not be "simultaneously responsible under a theory of accountability[.]" *Kline,* ¶ 18. Specifically, we concluded that the daughter was not legally accountable for the father's crimes under § 45-2-302, MCA, because, "1) [she] did "not knowingly cause Kline to commit incest; 2) § 45-5-507, MCA, does not make [her] accountable for Kline's conduct; and 3) [she] did not purposefully solicit, aid, abet, agree, or attempt to aid Kline to plan or commit incest". *Kline,* ¶ 20. The offense of incest is "qualitatively unique" because parties above a certain age are each held personally responsible for the offense. *Kline,* ¶ 21. *Kline* is not applicable here.

¶55 Rossbach persists that as a matter of law he could not be held liable under the felony-murder rule. He maintains that because the jury found him guilty of accountability for attempted robbery—meaning Whitworth was the principal actor—and because Whitworth undisputedly shot Flink and McLaughlin—meaning Whitworth caused their deaths—Whitworth was not a "person legally accountable for the [underlying] crime," and Rossbach therefore could not be convicted under § 45-5-102(1)(b), MCA. The District Court rightly rejected this confusing argument. Pointing out that a person is accountable for their own conduct, *see* § 45-2-301, MCA, the court reasoned that "someone who is personally responsible for a crime is also accountable for it – but it is equally clear that another person who is not personally responsible can also be held accountable." Rossbach essentially claims that "any person legally accountable for the [underlying] crime" must be a person *other* than the principal actor. This construction of the statute is not reasonable. "[T]he purpose of the felony-murder rule is to ensure that people who engage in dangerous acts likely to result in death are held responsible for any resulting deaths, whether or not the acts were planned or premeditated." *State v. Burkhart*, 2004 MT 372, ¶ 36, 325 Mont. 27, 103 P.3d 1037 (internal quotation and citations omitted). "The felony-murder rule creates an alternate means of holding one responsible for reckless actions likely to result in death." *Burkhart*, ¶ 36.

¶56 The felony-murder statute provides notice to a defendant that "should he or she choose to participate in a serious felony, and should someone be killed, the felon will be subject to criminal liability for deliberate homicide." *Burkhart*, ¶ 45. The District Court

23

determined that the verdict form showed the jury's finding that Rossbach was "legally accountable for the attempted robbery—which logically and under the circumstances here means the attempted robbery by Whitworth." The District Court also determined that "the jury found 'a person' who was legally accountable for the attempted robbery to have caused the death" of Flink and McLaughlin. The court determined that the verdict form wording, stipulated to by the parties, allowed "the jury to hold Rossbach accountable for the murders." The District Court's analysis is correct.

¶57 Finally, Rossbach argues that the State failed to meet its burden of proof because it did not present corroborating evidence that was legally sufficient to connect Rossbach with an attempted robbery of the victims. Here, Rossbach argues that we should adopt a new rule —similar to that for accomplices—that the testimony of jailhouse informants must be corroborated with other evidence. *See* § 46-16-213, MCA. The State responds that Rossbach did not make this argument to the trial court, that the jury was properly instructed, and that it presented ample evidence corroborating the informants' testimonies.

¶58 Prior to closing arguments in Rossbach's trial, the District Court instructed the jury on its consideration of the informants' testimonies. The instruction provided for each informant stated:

> You have heard testimony from [informant], a witness who received a benefit from the State in connection with this case. For this reason, in evaluating the testimony of [informant], you should consider the extent to which or whether his testimony may have been influenced by this factor. In addition, you should examine the testimony of [informant] with greater caution than that of other witnesses.

24

¶59 "We review jury instructions for abuse of discretion to determine whether the jury instructions, as a whole, fully and fairly instructed the jury on the law applicable to the case." *State v. Resh*, 2019 MT 220, ¶ 10, 397 Mont. 254, 448 P.3d 1100 (citing *State v. Johnston*, 2010 MT 152, ¶ 7, 357 Mont. 46, 237 P.3d 70). The District Court's instructions here adequately apprised the jury of the applicable legal standards and provided it sufficient guidance to evaluate the two informants' testimonies.

¶60 In conclusion, Rossbach has not demonstrated reversible error in the jury's determination that he committed deliberate homicide on a theory of felony murder. The court properly instructed the jury, and the State presented ample evidence that Rossbach was an active participant in the crimes. "In cases where we consider the sufficiency of the evidence, we will not substitute our judgment for that of the jury, which is able to view firsthand the evidence presented, observe the demeanor of the witnesses, and weigh the credibility of each party." *State v. Kelley,* 2005 MT 200, ¶ 22, 328 Mont. 187, 194, 119 P.3d 67, (citation omitted).

¶61 *4. Whether the District Court erred when it denied Rossbach's motion for a new trial based on* Brady *violations?*

¶62 A defendant's Fourteenth Amendment guarantee of due process extends to the State's obligation to disclose exculpatory evidence to the defendant. *Jackson*, ¶ 52 (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97 (1963)). To prove a due process violation for failure to disclose evidence that could be used to impeach a witness, a defendant must show: 1) the state possessed impeachment evidence favorable to the defendant; 2) the prosecutor suppressed that favorable evidence; and 3) if the evidence had

been disclosed, a reasonable probability exists that the outcome of the case would have been different. *State v. Reinert,* 2018 MT 111, ¶ 17, 391 Mont. 263, 419 P.3d 662 (citations omitted).

¶63 Rossbach contends that Informant 1's statements in a letter the State disclosed on the last day of trial could be used to impeach Informant 1's testimony by demonstrating his lack of credibility and that the District Court erred when it denied Rossbach's motion for a new trial based on the belated disclosure.

¶64 The letter contained Informant 1's statements denying involvement in a burglary offense on which he had pending charges. The informant stated in the letter that he "refused" to take part in the burglary but admitted pawning one of the stolen items. Upon defense counsel's motion at Rossbach's trial, the detective who had questioned Informant 1 provided an offer of proof as to his communications with Informant 1 regarding the burglary, during which he referenced the letter. The detective testified that Informant 1 denied taking part in the burglary; the detective also testified that he was unable to judge whether Informant 1 had been truthful in his answers about his involvement.

¶65 The letter in question was not suppressed but was disclosed, albeit belatedly. Even assuming, for argument's sake, that the State should have disclosed the letter much earlier in the case, the letter does not contain information favorable to Rossbach for purposes of impeaching Informant 1. The information in the letter does not substantially conflict with the statements the detective attributed to him. As the District Court determined, the letter did not significantly "cast doubt" on Informant 1's credibility and its admission would have

only confused the jurors. Rossbach has not plausibly shown a reasonable probability that the outcome of his case would have been different if the letter had been disclosed earlier. The District Court's determination that a new trial was not warranted on Rossbach's claimed *Brady* violation was sound.

## CONCLUSION

¶66 We affirm the District Court's denial of Rossbach's motion for acquittal, or in the alternative, for a new trial. Rossbach's conviction and sentence are affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR